**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br>    **Plaintiff,** <br><br>    **v.** <br><br> **PUBLIC PARTNERSHIPS, LLC,** a Delaware limited liability company**; DR. JAMES MCDONALD**, in his official capacity as Commissioner of the New York State Department of Health**;** and **AMIR BASSIRI,** individually and in his official capacity as Medicaid Director at the New York State Department of Health, <br><br>    **Defendants.** | **Case No.** _____ <br><br><br><br> **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

## INTRODUCTION

1.  From April 2024 through the present, the New York Department of Health ("DOH") and its officers have presided over and knowingly participated in an unlawful scheme with a private, for-profit corporation called Public Partnerships LLC ("PPL"). The scheme has funneled millions of dollars of extra revenue to PPL through DOH's Consumer Directed Personal Assistance Program ("CDPAP")—a substantial portion of which is ultimately reimbursed through the Medicaid program and paid for by the American taxpayer. The scheme has caused and continues to cause substantial harm to many thousands of vulnerable home-care Medicaid patients and caregivers, to small- and medium-sized New York businesses who were put out of business, and to the American taxpayer who ultimately is footing the bill. After a sham bid process, DOH installed PPL as the sole "fiscal intermediary" responsible for managing

1

and employing all the home-care caregivers that participate in DOH's CDPAP.  But PPL did not deliver the promised cost savings or execute PPL's takeover as sole fiscal intermediary for the CDPAP program on the contractually required timeline—as both DOH and PPL repeatedly represented PPL would and *could* do.  These failures inflicted substantial and foreseeable disruptions to caregivers, patients, and the entire CDPAP program, and drove up the costs of the CDPAP program to the tune of hundreds of millions of dollars.  When questioned about this scheme, PPL and DOH officials did not come clean; they doubled down and sought to conceal their actions.

2.      New York's CDPAP program provides home care through lay caregivers, including family members, to Medicaid patients with disabilities or significant medical needs. CDPAP has historically offered a lifeline to some of the most vulnerable New Yorkers who might otherwise fall through the cracks by providing them with dignified home-based care. As of fall 2024, CDPAP was one of New York's largest health benefit programs, with more than 250,000 patients and more than 300,000 caregivers.  CDPAP, like many other Medicaid programs throughout the Nation, is a healthcare program managed by the New York state government but paid for in large part by federal tax dollars through Medicaid reimbursements.

3.      Notwithstanding that the New York State Legislature passed a statute requiring a competitive bid process for the selection of the fiscal intermediary, and notwithstanding DOH's repeated public representations concerning the competitive nature of the bid process it established, PPL was preselected as the winner through a sham bid process.  PPL created an artificially attractive proposal by making repeated material misrepresentations in its bid regarding the nature and amounts of costs that it would charge to administer the program.

2

Moreover, and along with DOH, PPL made repeated, material misrepresentations about its ability to effectively take over the role of sole fiscal administrator of the CDPAP program on the contractually imposed timeline.

4.      As to the first category of misrepresentations, DOH made clear to PPL and the other bidders that money paid to the new administrator of CDPAP as "direct care" costs must flow to the CDPAP caregivers and could not be used as a cost-reimbursement or profit center for the new administrator.  PPL's bid proposal complied with this requirement—as did the contract it ultimately was awarded and signed. Notwithstanding this requirement, however, PPL nevertheless decided that it would impermissibly extract profits from direct care costs through an "hourly rate game" that would allow PPL to siphon as profits a small percentage of the cost of each hour of care billed to American taxpayers.  Because CDPAP bills approximately *350 million hours* of care to New York each year, even taking a few cents per hour as revenue would mean tens of millions of dollars in ill-gotten gains.

5.      As to the second category of misrepresentations, PPL's successful bid for the CDPAP contract with DOH contained numerous knowing misrepresentations. For example, PPL's bid submission materially misrepresented its staffing plan, its financial readiness to perform the contract, the quality of its in-house software, and other key aspects of its plan. PPL's bid also knowingly misrepresented that PPL was capable of transitioning into the role of sole fiscal administrator for the CDPAP program on the contractually prescribed three-month timeline.  In fact, DOH and PPL—in contravention of the contract's terms—had determined before the contract was signed that they should *triple* the transition timeline given the substantial

3

and known likelihood that PPL's transition as sole administrator for CDPAP would throw the CDPAP program into chaos.

6.     DOH and PPL have spent nearly two years peddling falsehoods, misrepresentations, and material omissions about these topics to patients, caregivers, legislators, and the public.  They have made false representations regarding almost everything related to CDPAP, including: the sham bidding process that installed PPL as the sole FI; the status and progress of the blundering transition of patients and caregivers to PPL; the extent of disruptions to patient care and caregivers' livelihoods; changes to caregiver pay; supposed cost savings that would flow to the state from PPL's takeover of CDPAP; and strict contract requirements that would be observed for the appropriate management of public funds. These misrepresentations, and the financial malfeasance they facilitated, have continued to this day.

7.     Plaintiff, the United States of America, brings this action under 18 U.S.C. § 1345, which authorizes the Attorney General to seek an injunction to enjoin ongoing Federal health care offenses, including false statements made in connection with a health care benefit program, health care fraud, and conspiracies and attempts to commit these offenses. An injunction is necessary to stop Defendants from making false statements and misrepresentations related to CDPAP, to stop PPL's siphoning of funds from the federal coffers, and to unwind the damage DOH and PPL have already caused through these violations of federal law.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 because Defendants' alleged Federal health care offenses have harmed members of the public in the United States and in this District.

4

9.      Venue is proper in this district under 18 U.S.C. § 1345; 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (d); and 28 U.S.C. § 1395(a).

## THE PARTIES

10.     Plaintiff is the United States of America.

11.     Defendant PPL is a limited liability company corporation organized under the laws of Delaware with a principal place of business at 8000 Avalon Boulevard, Suite 300, Alpharetta, Georgia.  PPL transacts and has transacted business in this District.

12.     Defendant DR. JAMES MCDONALD is the Commissioner of the New York Department of Health. In his official role, MCDONALD has participated in directing and supervising the CDPAP transition effort.  He is being sued in his official capacity only.

13.     Defendant AMIR BASSIRI is the Deputy Commissioner of the Office of Health Insurance Programs and New York State Medicaid Director at the New York Department of Health. In his official role, BASSIRI has participated in directing and supervising the CDPAP transition effort.  He is being sued in both his official and individual capacities.

## NEW YORK'S CDPAP PROGRAM

14.     New York's CDPAP program provides home care through lay caregivers, including family members, to Medicaid patients with disabilities or significant medical needs. CDPAP has historically provided many of the most vulnerable New Yorkers who might otherwise fall through the cracks with dignified home-based care.

15.     As of fall 2024, CDPAP was one of New York's largest health benefit programs, with more than 250,000 patients and more than 300,000 caregivers.  CDPAP, like many other Medicaid programs throughout the Nation, is a healthcare program managed by the

New York state government but paid for in large part by federal tax dollars through Medicaid reimbursements.

16.     The CDPAP ecosystem has five essential levels of actors, each having a role in ensuring that home care is delivered to CDPAP patients and that CDPAP caregivers are paid.  In essence, the money to pay CDPAP caregivers goes from: (1) the State of New York, to (2) the Managed Care Organizations ("MCOs"), to (3) the Fiscal Intermediary, to (4) the CDPAP caregivers (who provide service to the CDPAP patients).  This is a brief, simplified description of each link in that chain, followed by a visual depiction of a simplified version of the program:

a.     **The State of New York**, acting through DOH, administers the CDPAP program and sets rules for how the program should be run.  DOH sets "capitated" rates whereby it pays a certain amount of money per CDPAP patient per month to the MCOs that service those patients.  That money comes from state funds, and about half of it is reimbursed to the State of New York by federal dollars through Medicaid.

b.     **Managed Care Organizations ("MCOs")** are essentially health insurance companies that enroll, among others, CDPAP patients.  MCOs make sure that their enrollees meet state requirements for care in the CDPAP program, and then provide authorizations for those patients to receive certain amounts of hours of home-based care through the program.  Like other insurance companies, MCOs are compensated by the difference between the amount of money they receive to service CDPAP patients, and the amount of money they pay out for the care of those patients.

6

c.   The **Fiscal Intermediary** is the employer of record for the CDPAP caregivers. The FI's role is to handle employment paperwork and payroll for the CDPAP caregivers.  As part of this role, the FI contracts with the MCOs and agrees on the hourly rate that it will bill the MCOs for the hours of care that the CDPAP caregivers provide.  Prior to 2025, there were nearly 600 FIs, many of them small- and medium-sized New York businesses that also provided other types of home-health services.  Prior to 2025, as described in more detail *infra*, the primary way that the FIs were compensated was through a system where the hourly rate they billed to the MCOs was slightly higher than the compensation package that the FIs provided to the caregivers.

d.   **CDPAP Caregivers** provide home-based care to CDPAP patients.  They are paid on an hourly basis by the FI and receive pay and benefits according to New York law.

e.   **CDPAP Patients** are New Yorkers with disabilities or other needs that require home-based care.  CDPAP patients select the caregivers that they want to provide their care, and sometimes are able to select family members to work as their caregivers. While CDPAP patients in some senses "employ" their caregivers as a joint employer with the FI, the FI is the employer of record.

7



17.    CDPAP is a "health care benefit program" under federal law. *See* 18 U.S.C.

§ 24(b). By extension, false statements or fraudulent acts related to CDPAP, such as the litany

detailed below, constitute violations of federal statutes governing federal health care benefit

programs and their funding. *See* 18 U.S.C. §§ 371, 1035, 1347, 1349.

## THE PPL-DOH SCHEME

**I.    April 2024 – May 2024:  In Advance of a Sham Bid Process, DOH Selects PPL As the Presumptive Statewide FI**

18.    In March and April 2024, while the state budget was being negotiated by political

officials, PPL learned that the state was considering designating a single entity as the sole FI for

the CDPAP program.

8

19.     In response, PPL lobbied to have itself become the sole FI for CDPAP—a lobbying push that was almost successful. An April 2024 draft bill, which was not released to the public until over a year later, included language enshrining PPL as the state's sole FI: "No later than March 31, 2025, the department of health [sic] through the commissioner, shall contract with Public Partnerships, LLC ("Statewide FI") to provide on a statewide basis the services of a fiscal intermediary…."

20.     In closed-door sessions in early April 2024, the Legislature rejected this proposed language. Instead, the final budget enacted for fiscal year 2024-2025 included an amendment consolidating CDPAP under a single, statewide FI, without designating who that FI would be. Instead, the law mandated that the FI be selected through a procurement process. N.Y. Soc. Serv. Law. § 365-f(4-a)(a)(i) ("'Statewide fiscal intermediary' means an entity that provides fiscal intermediary services … and is selected through the procurement process described in paragraph (b) of this subdivision."). This legislation directed "the commissioner [to] award such contract to the contractor that meets the criteria for selection and offers the best value. . . ." *Id*.

21.     Notwithstanding the statutory mandate for a competitive bid process, PPL recognized internally that the process had been "bias[ed]" toward PPL and noted that the selection criteria would eliminate most of their competitors.  For their part, DOH officials already had begun discussing PPL internally as the presumptive choice for the contract before the statute was passed, bypassing PPL's competitors.  On March 26, 2024, BASSIRI reached out to a state government contact in Ohio to ask for her insights on New York potentially using PPL for the CDPAP transition. In his March 26, 2024, email, Defendant BASSIRI specifically referenced PPL's tie to its ex-parent company, Public Consulting Group ("PCG"), as well as

9

discussions between DOH and New York state "legislative staff" about using PPL for the CDPAP transition contract.  BASSIRI was very familiar with Boston-based PCG because PCG is a DOH contractor, with numerous PCG employees working under BASSIRI and alongside DOH employees to administer New York state Medicaid programs.

22.    Internal and external email correspondence from DOH decisionmakers show that—long before a competitive bid process was conducted—DOH was openly contemplating that PPL (and no other entity) would be the sole statewide FI.  In an April 4, 2024, email, a PPL principal wrote to BASSIRI and another DOH official to thank them for meeting to discuss PPL's "implementation plan" for the CDPAP transition. Similar exchanges between DOH and PPL during April 2024 show that far from being "general communications" (as they were later misleadingly described), DOH and PPL discussed detailed operational and cost considerations for a planned CDPAP transition by PPL.  PPL even requested specific payment rates from the state. In an April 5, 2024, email, Alayna Bochenek of PPL wrote to BASSIRI and another DOH official to provide, "[a]s requested," PPL's formal "implementation plan."

23.    In a follow-up communication reflecting the highly guarded nature of DOH's nascent partnership with PPL for the planned CDPAP transition, a PPL executive wrote to BASSIRI on April 9, 2024, to assure him that PPL was "treating this information as highly confidential" and "**will not discuss the matter**[1] [*i.e.*, the CDPAP transition project] with outside parties."

---

[1] Emphases added in bold throughout.

**II.    June – September 2024:  DOH Conducts Sham Bid Process**

24.    DOH's Request for Proposal ("RFP") for the CDPAP contract, RFP #20524, was announced to the public on June 17, 2024.  The RFP set a number of requirements for bids.  First, the RFP required bidders to show that they were, pursuant to the law passed by the legislature, providing FI services on a statewide basis in at least one state other than New York.  Then, the RFP required a "technical proposal" that described how the bidder would perform FI services and transition the CDPAP program.  Finally, the bid required a "cost proposal" that would describe the administrative costs that the bidder proposed to have New York pay on a per-member, per-month basis to the successful bidder.

25.    PPL submitted its bid on August 21, 2024.  Its bid included a technical proposal that touted its experience in other states performing similar services, its staffing model, its technologies that it claimed would ensure a smooth transition, and the promised move of its corporate headquarters to the Albany area.

26.    PPL's cost proposal indicated that it would accept a $68.50 per-member, per-month payment for the life of the contract as its sole compensation for running the CDPAP program.  Notably, PPL's cost proposal in its bid was significantly lower than the $99 per-member, per-month payment it had proposed to DOH prior to the commencement of the bidding process.

27.    The bid process proceeded in three stages—qualifying the bidders, scoring the technical proposals of the remaining bidders, and scoring the cost proposals of the remaining bidders.  Each of these stages was skewed in favor of PPL, either by PPL misrepresentations or DOH malfeasance.

11

28.    Internal DOH communications establish that DOH sought to disqualify as many other bidders as possible after starting to score PPL's bid; ultimately, DOH disqualified 132 bids by September 17, 2024.  DOH then quickly scored the remaining few non-PPL bids that it had not been able to disqualify on other grounds. In fact, DOH had already started scoring PPL's bid weeks before it disqualified other bidders; Defendant BASSIRI was part of an effort to disqualify other qualified bidders after he had already *personally scored* PPL's successful bid.  As late as Tuesday, September 17, 2024, Defendant BASSIRI was part of last-minute email exchanges with DOH's counterparts in other states in which DOH officials stated that under some sort of "pressure from our Governor's Office," they were trying to determine whether other bidders—at least one of whom ended up being a qualified bidder—were actually performing FI services in other states and were therefore qualified bidders.

29.    At least some of the other bid disqualifications were pretextual.  For example, one apparently qualified company was disqualified because DOH had difficulty accessing a PDF that the company sent as part of its timely bid submission.  Another qualified company proposed to form a subsidiary in New York to handle the contract, and DOH disqualified that bidder because, even though the bidder provided FI services in 14 states, the new subsidiary itself did not provide FI services in another state.  (DOH would later allow PPL to use a dormant subsidiary to execute the CDPAP contract.)  Another qualified bidder was apparently disqualified because, while it provided FI services in at least one other state, it had not contracted directly with that state's Medicaid office to do so.  Instead of seeking clarification on these minor wrinkles, and unlike the apparent red-carpet treatment that PPL's bid received, DOH highly scrutinized other companies'

bids until the last moment, disqualifying them automatically without informing them ahead of time—and not even scoring their bids.

30.    To date, DOH has never leveled with bidders, state legislators, or the public regarding the pretextual nature of the procurement process DOH conducted for this valuable state contract.

**III.    PPL's Bid Contains Materially Misstatements That DOH Failed to Vet**

31.    PPL's bid submission contained numerous material misrepresentations and promises that PPL never intended to satisfy.

32.    For example, PPL misrepresented its staffing plan for how it planned to execute the transition despite a clear RFP requirement that it maintain an "effective organizational structure" with "qualified administrative staff."  In order to fulfill this requirement and demonstrate its ability to transition hundreds of thousands of patients and caregivers, which was another bid requirement, PPL promised to hire qualified agents with years of experience "working with healthcare, social services, or related programs" for the critical job of enrolling consumers and caregivers, and then promised to "intensive[ly]" train them:

| Enrollment Team | • 3+ years' experience working with healthcare, social services or related programs<br>• 3+ years' customer service experience<br>• Proficient written and verbal communication skills, bi-lingual preferred<br>• Excellent attention to detail<br>• Deploys a culturally sensitive approach<br>• Proficiency in Microsoft Office Suite |
|---|---|

**Specialized Training for Call-Handling Agents**

New call-handling agents undergo an intensive training process focused on first call resolution. This includes:

- **Audit and Coaching:** Same-day audits and coaching for the first few weeks of call handling.
- **Call Handling:** Procedures for escalations and language or other accommodations.
- **Ongoing Performance Analysis:** Metrics are reviewed weekly, and agents are provided regular performance reviews and coaching to ensure continuous improvement.

33. PPL's bid submission also criticized rival vendors who "may say that they have over 1,000 employees … [but] many of those employees … do not hold an administrative role in the organization." But PPL's bid submission likewise misrepresented the caliber and credentials of its actual, planned transition workforce. For example, PPL's bid represented that it would recruit "employees who are leaving other FIs across the state, and **who have exemplary knowledge of CDPAP**…" These representations of a transition team comprised of nearly 1,000 qualified administrative professionals—such as tech engineers, financial administrators, and CDPAP veterans—bore no meaningful relation to the army of call center temp workers PPL planned to hire to actually conduct the transition. PPL's 432-page bid submission nowhere disclosed a plan to rely on a glut of temp workers supplied by third-party contracting agencies to staff the transition. Defendant BASSIRI scored PPL on the relevant metrics as "excellent" or "very good," higher than some other qualified bidders.

34. PPL similarly misrepresented the nature of the central in-house web platform that would facilitate the complex transition effort, which would require seamlessly orchestrating, logging, and rapidly responding to hundreds of thousands of enrollment requests in short order.

14

In its bid, PPL touted its in-house software platform—called PPL@Home—as providing a complete, "streamlined" experience that would provide a "seamless experience for all NY users."

> PPL@Home, our web-based user portal, provides a streamlined business process flow inclusive of enrollment, budget management, EVV, payroll, claims, and reporting. PPL@Home is the single sign on, front door to our systems, providing a modern user interface, 24/7 self-service features, improved enrollment processes, and electronic conveniences.

35.     These representations were part of the "best practices" evaluation section of the RFP.  Defendant BASSIRI scored PPL's bid as "very good" in this category—higher than he scored some other qualified bidders.  But in reality, PPL@Home did not exist when PPL submitted its bid on August 21, 2024.  Instead, PPL built this new platform from scratch beginning in September 2024; it had never been used before and would ultimately prove to be rife with glitches and breakdowns. A top PPL executive acknowledged internally that PPL could not tell the truth about PPL@Home: "[P]lease DO NOT EMPHASIZE its [sic] a brand new system… concerns on the optics of launching a brand new system for this program."  Similarly, PPL represented in its bid submission that it actively conducted trainings for its team members on PPL@Home, even though one of its EVPs told the bid drafters that such trainings did not exist.

36.     PPL's bid submission also represented that PPL had "a financial capital structure plan that supports the startup costs needed for this contract." This fulfilled, among other components, the RFP's requirement that bidders be capable of serving consumers and demonstrate their financial readiness to perform.  Defendant BASSIRI scored PPL's bid as "excellent" or "very good" in these categories, higher than some other qualified bidders.

15

However, in reality, PPL knew that its finances were insufficient to launch or competently execute the contract on day one. An October 2024 presentation to PPL's board discussed that, given expected end-of-year cash reserves of only $8.4 million, PPL needed to pursue a substantial round of private equity financing immediately prior to the transition to try to fund its work on CDPAP.

**IV.    September – December 2024: PPL Manipulates and Disregards the Financial Structure of the Contract, and DOH and PPL Sign a Sham Contract**

37.    Historically, CDPAP program FIs operated low-margin businesses that covered expenses and made money through what is colloquially called the "spread."  The "spread" refers to the difference between the amount of money FIs had agreed to bill the partnering MCOs for CDPAP services and the amount of money the FIs paid their caregivers—this latter amount being heavily regulated and subject to numerous wage laws.  The pre-PPL "spread" included various business, administrative, and other payroll and payroll-adjacent costs.  As a rough example of the way the system previously functioned, a legacy FI might be allowed to bill an MCO $24 per hour for services, but the total benefits package that the FI provided to the caregivers might cost the FI only $22.50 per hour on average.  Hence, the FI paid its various costs and made profit through this $1.50 per hour "spread."

38.    The RFP and contract made clear that this "spread"-based system was being replaced and that the sole FI would be compensated solely with a "per member per month" ("PMPM") payment from the state to compensate the FI for all costs.  A PMPM payment works as follows: if the PMPM payment is set at $50 and the FI administers 1,000 patients in a given month, the FI gets a flat payment of $50,000 that month for its administrative costs and profit.  In

16

the CDPAP RFP, the RFP amendments, the RFP Q&A documents, and the contract, DOH made clear—and PPL agreed—that a constant, unchangeable PMPM for the five years of the contract would now be the <u>sole</u> way that the FI could cover its costs and earn a profit.

39.     DOH made this key point crystal clear in formal Q&A responses provided to prospective bidders by DOH in August 2024 and incorporated as operative terms of the contract. In response to the question, "Will the selected FI be permitted to negotiate payment rates with MCOs? If so, will the negotiated payment rates include compensation for administrative costs? If so, will the negotiated payment rates include compensation for direct care costs?" DOH's answer unequivocally shot down any such possibility: "The administrative costs will be compensated **via the contracted PMPM established under this RFP exclusively**." Similarly, in another Q&A response, DOH reiterated that "Administration will exclusively be paid through the PMPM" while separate billed rates for direct care would "flow[] to the [CDPAP] worker," not the statewide FI:

> Currently, the FI vendors bill for full services, but only pay out a portion of their billing. The difference between the two is income or revenue to the FI. However, this contract calls for a PMPM as payment to the FI. Does the Department intend to stop the practice of allowing the FI to bill for the full services?

> Administration will exclusively be paid through the PMPM established under this contract. Direct care will be paid through existing means with the expectation it flows to the worker

40.     Relying on these DOH statements, other bidders analyzed their expenses and anticipated profits and included in their bids proposed PMPM payments that reflected the realities of their businesses.  For example, one legacy FI proposed a PMPM payment of $126 for the five-year length of the contract under the assumption that, in keeping with the RFP's strict

17

PMPM requirement, this would be the only money available to cover its costs and to generate profit. In contrast, PPL proposed a $68.50 PMPM payment for the life of the contract, the lowest bid by far, and thereby obtained a perfect score in the "cost" component of its bid.

41.    PPL falsely certified in its bid that it would not be reimbursed by any source other than the PMPM, and further falsely certified that it would not seek to increase the costs of the contract if it won the contract:

> The Contractor will **not** be reimbursed separately by NYS or any other entity for any Administrative Services outside of its proposed ~~single~~ all-inclusive PMPM <u>for Administrative functions and its all-inclusive PMPM for Initial Transition Costs</u> bid under this RFP. ~~This~~<u>The</u> ~~single~~ all-inclusive PMPM <u>for Administrative functions and the all-inclusive PMPM for Initial Transition Costs</u> will be for all populations in all regions and must consider all aspects and functions of the Statewide FI.

> **B. CERTIFICATION REGARDING COST PROPOSAL SUBMISSION**
> The undersigned Bidder/Offeror hereby certifies and agrees that the following information is correct: In preparing and developing its cost proposal and the total cost submitted for this project, the Bidder/Offeror considered all expected, potential, and anticipated costs associated with the performance of the services to be provided and implementation of the entirety of the project for the term of the awarded contract. The Bidder/Offeror hereby certifies that its cost proposal reflects a competitive and accurate reflection of the cost of the project and Bidder/Offeror does not reasonably anticipate the need to request an increase in the cost proposal after award of the contract or submission of change orders for cost overruns or increases. Bidder/Offeror hereby certifies its cost proposal is a good faith representation of the Bidder/Offeror's cost to New York State for the project including actual costs and proposed markup and that such cost is being considered in conjunction with the Bidder/Offeror's technical merit to determine an overall best value score of the final proposal submitted. Bidder/Offeror understands that its bid may be disqualified by the State of New York if the State believes that the cost proposal does not accurately capture costs that would result in successful completion of the project and/or does not represent a responsive and responsible bid proposal.

42.    PPL's misleading cost proposal certification was signed under penalty of perjury. The certification provided false assurance that PPL did not anticipate seeking additional cost coverage and that the cost proposal provided an "accurate reflection" and "a good faith representation" of the cost of its project. Despite these representations, PPL all along planned to win the contract by submitting a fraudulent "recklessly low bid" on the PMPM and making up the difference by taking a cut from the billable rate. That is, PPL made its bid seem most attractive by pretending that it would make only $68.50 per member per month, but in reality it

would attempt to preserve the old system where it also was able to get a cut of the billable rate that was supposed to go to caregivers.

43.    In a July 12, 2024, planning email several weeks after the RFP announcement, a PPL employee circulated a presentation that addressed PPL's revenue plan for the CDPAP contract. The presentation was sent to a PPL team working on the CDPAP contract that included PPL's President and its CFO. The attached presentation explained that PPL needed to seek revenue beyond what it would make from the PMPM: "We must make profit on that rate [hourly billable rate] to catch up on the low PmPm [that PPL had bid for the contract]":



44.    In PPL's subsequent, internal financial cost models for the CDPAP contract developed by PPL's CFO and Finance team, PPL closely hewed to this framework. PPL's financial models continually separately modeled one revenue stream tethered to the PMPM and

19

another independent revenue stream tethered to the CDPAP hourly billable rate for caregiver services.

45.     In a July 24, 2024, email sent by a PPL VP to a PPL executive, the PPL VP mapped out PPL's planned approach for generating revenues from CDPAP, writing that "I think **this hourly rate game is going to become our hobby**," and providing an accompanying financial analysis.  The attached analysis indicated that PPL could aim to pocket as much as 20 to 35 percent of the differential between CDPAP plan rates for caregiver per-hour compensation and caregiver wages, amounting to very large amounts of revenue.

46.     Other contemporaneous evidence underlines PPL's plan.  In an October 2024 financial model, PPL modelled two separate categories of EBIDTA (Earnings Before Interest, Taxes, Depreciation, and Amortization) that it planned to obtain from the CDPAP contract—one derived from the PMPM payments (which PPL defined as "Net Operation Income (EBITDA)"), and a separate stream of EBITDA derived from hourly billable rate margins (which PPL defined as "Billed Rate EBITDA"). According to this model, PPL's "Billed Rate EBITDA" was projected at approximately $134M across the five-year life of the contract, and, for Years 2-5 of the contract, hovered at around 40-45% of the Total EBITDA for the contract.

47.     Similarly, in the months leading up to the CDPAP transition launch, PPL repeatedly modelled what it defined as a "spread" in the CDPAP hourly billable rate and an "EBITDA Margin" that would be left over for PPL once payments and costs had been subtracted—*i.e.*, a residual portion of that spread. For example, as part of the October 2024 financial model referenced above, PPL modeled an "EBITDA Margin" of "1.2%," translating into approximately $26.8M in additional EBITDA for PPL per year.

20

48.    PPL did not in fact know how much many of the line items it included in its billable rate modeling would objectively cost—even as PPL continually attributed specific costs to those items that it claimed justified maintaining specific billable rates and "spreads" between billable rates and pay rates.

49.    What PPL did know, on the other hand, was what specific hourly billable rate "spread," and resulting billable rate EBITDA margin, it sought to target to improve PPL's ability to cover its own administrative costs and generate its own profits. By lobbying DOH and MCOs to increase or maintain the overall hourly billable rates for CDPAP and the size of the "spread" between billable and pay rates, PPL aggressively protected its own financial interests and profitability. It did so even while internally acknowledging that PPL did not in fact know what significant line items it included in its modeling would cost.

50.    PPL similarly touted the specific profits PPL would make from CDPAP hourly billable rates in correspondence with prospective lenders from whom PPL sought to obtain a significant line of credit necessary to fulfill the promises PPL made in its bid. For example, in a November 2024 exchange between PPL and a prospective lender, a VP of PPL's parent company sent the lender a confidential memo that outlined the sources of revenue PPL would derive from the CDPAP contract, emphasizing that in addition to revenue from "PMPM fees," PPL would also obtain "Billable Rate revenue." The memo explained that this "final revenue stream stems from the Billable Rate model. . ."

51.    In another November 2024 email to the same lender, PPL's CFO answered the lender's question, "Can you expand on the Pay Rate / Bill Rate management component of the NY Contract," with the following response: "The Bill Rate / Pay Rate component relates the [sic]

21

$9B in total Program Costs that we will manage … Managing these expenditures **is expected to yield a minimum of $25M in additional EBITDA** [in addition to "~$25M in expected EBIDTA" from "[t]he PMPM rate"]."

52.    PPL's pursuit of an additional revenue stream with which to cover its administrative costs and ensure greater profits also came to take on a subtler form after the contract was signed—apparently when PPL came under scrutiny from DOH and/or MCOs to explain why its purported "costs" included line items that would seem to generate profits for PPL.  PPL then shifted to falsely recharacterizing the "spread" billing it planned as being based on its direct-care costs.  But these breakdowns of its purported direct-care costs were not real; PPL acknowledged internally that it did not know what its costs were because, among other things, it had not yet serviced a single CDPAP patient.  That is, instead of building out its actual direct-care costs for the CDPAP program—which PPL admitted internally that it did not know and could not reliably calculate—PPL started from the high billable rate from the prior "spread" billing system, and then sought to justify that rate by speculating about costs that it might incur when it started administering the program.

53.    In correspondence with DOH, PPL sought to justify this approach as being necessary to hedge against the financial risks PPL was taking on by administering CDPAP— even though the contract that PPL signed was clear that any such risks were to be accounted for through the exclusive PMPM rate. Meanwhile, PPL internally discussed its need to keep making the costs it was imposing look low on paper, so that CDPAP stakeholders did not get suspicious about what was going on behind the scenes. In a November 2024 email, a PPL VP said of the

22

artificially low PMPM: "Optically, we need to keep the public *on-paper* costs low . . . Our pmpm will be scrutinized for being so low[.]" (emphasis in original).

54.    In effect, realizing that its plan to extract significant profits from the billable rate might not succeed on its own terms, PPL eventually sought to reframe these revenues as mere cost-covering intrinsic to line items in the CDPAP billable rate. That is, PPL resorted to presenting the purported costs of line items in the CDPAP billable rate in a way that would ensure the company obtained a greater revenue share than it otherwise would have. This accounting sleight of hand allowed PPL to obfuscate its efforts to expand its profits. The net result was that New York, and taxpayers, did not get the cost-saving deal they were promised in PPL's bid.

55.    In addition to amounting to a raid on federal health care benefit programs through excessive profit-taking proscribed by the contract, PPL's "hourly rate game" also reveals how PPL's artificially low PMPM distorted the RFP bid process in its favor. The other bidders had apparently adhered to the contractual requirement that costs be recouped only through the fixed PMPM component and had, as a result, submitted proposed PMPM rates that were materially higher than the "recklessly" low PMPM bid by PPL—a sham figure given PPL's contemporaneous plan to exploit a separate (and contractually forbidden) fee stream for recouping its costs and earning its revenues.

56.    The fruits of PPL's unauthorized, fraudulent exploitation of CDPAP hourly rate billing—hidden behind the fig leaf of a pretend, lowball PMPM used to secure the contract—continue to this day in the form of a windfall that PPL has earned and continues to earn from CDPAP each month.

23

57.     On December 20, 2024, PPL signed a contract with DOH to be the sole FI for CDPAP.

**V.     November 2024 – April 2025:  DOH Fails to Require PPL To Comply With the RFP, Bid, and Contract**

58.     Over the course of many months, DOH acquired knowledge or was willfully blind to its knowledge that PPL was failing to abide by the promises in its bid submission and in the billion-dollar contract PPL had been awarded.  And yet, because PPL was a preferred vendor ever since DOH solicited it to be the sole FI in March 2024, DOH failed to take meaningful action to curb PPL's transgressing of the contract and to ensure that PPL did what it had promised to do and did not do what it had promised not to do. Instead, even as DOH learned of important deviations by PPL from the contract, it stood by idly—limiting itself at times to expressions of internal consternation not matched by any remedial action.

59.     For example, as described above, PPL falsely promised in the bid and contract that it was adequately capitalized to effectuate the transition.  But PPL's financial situation was so precarious that it told DOH that it needed large, upfront payments from DOH before it had serviced a single CDPAP patient in order to stand up the transition.

60.     One of these large, upfront, lump-sum payments translated into $40.5 million paid by DOH to PPL in early January 2025—before PPL had successfully transitioned a single CDPAP member, and despite language in the RFP and contract that the payments for "Initial Transition Costs" would only "be paid monthly on the actual number of consumers fully transitioned…" A DOH manager sounded the alarm on this and other issues in an internal, November 22, 2024, DOH email: "PPL won the bid at a certain payment amount, but now the

State is going to pay PPL more money for a previously known expectation. How is that fair to the other bidders and why wasn't this cost included in PPLs initial bid?" Internally, PPL realized that it was getting an extra-contractual windfall: "DOH knows what the RFP says but still agreed to pay us in Jan[uary]. They agreed to pay the 12 months in a lump sum and reconcile later in the year."

61.     Recognizing its lack of a financial capital structure sufficient to effectuate the transition without additional support, PPL similarly demanded, and received, multi-million-dollar cash advances from CDPAP MCOs even though such advance payments were nowhere contemplated by the RFP.  When MCOs complained about, or suggested they would balk at, these upfront payments, PPL leveraged its monopoly power over CDPAP by threatening not to contract with them if they refused to acquiesce—turning PPL's demand for massive payments nowhere contemplated by the RFP into a condition precedent for continuing to be a part of CDPAP.  DOH did not act to resolve the situation or protect the MCOs.  To the contrary, it asked PPL for periodic updates on how its upfront payment negotiations were going with the MCOs.

62.     DOH also failed to impose on PPL the explicit limitations in the RFP and contract about PPL not making profits from the billable rate.   DOH's knowledge of PPL's activities was thorough, and yet it did nothing to prevent PPL covering its costs, including administrative costs, by billing higher rates than it paid to caregivers—exactly what DOH's contract with PPL said it was not allowed to do. DOH was repeatedly made aware of PPL's efforts to obtain revenues and profits beyond the PMPM.

63.     In a November 2024 internal DOH exchange, a senior DOH employee sounded the alarm about this issue, writing to a large contingent of his colleagues that a meeting between

25

his team and PPL had left him "not impressed" and "concerned" because PPL "seemed to have the tone that we were negotiating direct care and admin rates, which was not our understanding." He also reported to his colleagues PPL's statements during the meeting that its billable rates may need to be *higher* than current rates in order for PPL to make a *profit*. He asked his colleagues for assurance that "we have guardrails in place to force the expected savings" the CDPAP contract was intended to realize, given PPL's efforts to extract revenues beyond what the RFP contemplated.

64.    Throughout late fall 2024 and January 2025, MCOs engaged in difficult negotiations with PPL repeatedly complained to DOH that PPL was proposing doing exactly what the RFP and the contract said it could not do—recoup costs and earn revenue from the "spread" by billing the MCOs at per-hour direct care rates that were meaningfully higher than the compensation packages that PPL was paying CDPAP caregivers. The MCOs reported that PPL proposed to bill the MCOs at per-hour rates *even higher* than what the MCOs were then paying the legacy FIs. MCOs also repeatedly informed DOH that PPL had misled them by stating that DOH had formally approved these and other financial proposals that benefited PPL, when no such thing had occurred—leading the exasperated MCOs to tell senior DOH leadership that "PPL reports to represent DOH positions, which have not been communicated directly to plans by DOH and seem contrary to federal and state rules and policy." In fact, the health plans in their complaint to DOH gave an example of rates that the health plans calculated should be the direct-care rate compared to the much higher rates that PPL proposed to—and eventually did— charge:

> PPL is telling plans that DOH has "agreed" that there will be standard rates to be paid by all plans based on FFS rates. Because DOH has stated that there will not be a directed payment, we do not understand how there could be a standard rate. In addition, information shared by one plan (below) shows that the proposed FFS rates are substantially higher that what plans currently pay their FIs. Other plans have confirmed the same. In addition, information shared with plans by PPL shows that additional administrative costs are included in these rates, which plans understood was not permitted under the RFP. The reimbursement rates PPL is seeking seem to be contrary to the savings estimates included in the FY25 enacted budget associated with this initiative.

| Region | Health Plan Rate Calculation | PPL Rate Calculation | Difference |
|---|---|---|---|
| NYC | 23.87 | 26.88 | -3.01 |
| LI/Westchester | 23 | 25.72 | -2.72 |
| MHNM | 18.82 | 24 | -5.18 |

Over the course of the contract, the difference of just one dollar adds up to about $1.75 billion, meaning that the MCOs were telling DOH that PPL was proposing to obtain as much as *$5 billion* or more beyond what they believed was warranted. And yet DOH did not take steps to rein in the out-of-control spending that PPL's proposals represented.

65.     Defendant BASSIRI even personally expressed incredulity that PPL proposed to bill the state as direct care costs items that had little or nothing to do with paying caregivers, including items like medical malpractice and liability coverage that served to benefit PPL. Defendant BASSIRI called PPL's behavior "opportunistic" and predicted allowing PPL to obtain these revenues would "backfire."

66.     To date, PPL's intentional and improper inflating of the CDPAP hourly billable rate to secure additional revenues for PPL outside of what the contract allowed has never been rectified by New York—contributing to a substantial windfall for PPL and an ongoing, onerous bill for taxpayers.

27

**VI.    January 2025 – April 2025: PPL and New York Make False Assurances to CDPAP Patients and Caregivers About the Transition, Which They Knew Could Not Be Accomplished and Which Was an Unmitigated Failure**

67.    PPL and DOH realized before the official three-month transition launch—which occurred on January 6, 2025, in anticipation of PPL completing its takeover as sole FI on April 1, 2025—that the three-month transition timeframe posed a significant risk of disruptions to care and payments along with an enrollment logjam.  Moreover, multiple constituents in the CDPAP ecosystem—MCOs, patient advocates, and even PPL itself—told DOH repeatedly, over the course of months, that the transition math simply did not add up.  PPL's internal discussions, likewise, reflected concerns about PPL's ability to timely accomplish the transition. Indeed, PPL's own original, formal transition plan presented to DOH in April 2024 stipulated a projected 180 days for patient and caregiver enrollment, and a project schedule of 300 days. Internally, both DOH and PPL leads expressed concerns prior to PPL's three-month transition about its unrealistic and risky timing.

68.    Taking stock of these risks, prior to the transition, PPL executives and DOH staff discussed a remarkable, undisclosed plan in late 2024 to *triple* the transition timeframe, extending the deadline from April 2025 to September 2025 and to maintain preexisting CDPAP administrative arrangements during that period to avoid endemic disruptions to patient care and caregiver pay.  In a pre-transition launch meeting in October 2024, DOH and PPL stakeholders discussed this extended timeframe as necessary to mitigate significant risks of disruptions.

69.    Against the backdrop of these deliberations, DOH received a decisive marching order directly from the Governor's office *not* to deviate from the April 1 transition deadline.  As a DOH principal informed her team on October 18, 2024: "I wanted to give you a heads up **that**

28

**Chamber is coming in hard on the SFI [Statewide Fiscal Intermediary] launch**, they really aren't entertaining options to move off of a path that gets this done by 4/1. We will not be advancing statutory or regulatory changes [to extend the CDPAP transition timeframe] at this time." Adapting to this pressure from the Governor's office, DOH chose not to act on its knowledge of the need to mitigate looming risks from PPL's transition effort, or to transparently communicate those risks to the public.

70.    Despite their awareness that the transition of PPL as the sole administrator for CDPAP within the three-month contractual period presented significant risks of harm to CDPAP patients and caregivers, Defendants repeatedly made one of their most central and most persistent misrepresentations—that the transition would not disrupt patient care services or worker payments and would smoothly hit the April 1 transition deadline.

71.    For example, New York officials, including DOH officials, represented to the public that PPL's transition of the program would be effectuated while "ensur[ing] that caregivers continued to receive timely payments and avoid[ing] any disruptions in services for those who rely on the program." Similarly, Defendant MCDONALD informed the public that the CDPAP transition would not have any detrimental impact on current CDPAP patients' services or caregiver selection. "If you're a CDPAP user," he explained, "you can keep your trusted caregiver." Likewise, "If you're a caregiver, it will be easier for you to get paid."

72.    Likewise, PPL repeatedly assured the public that PPL's CDPAP transition effort was merely administrative in nature and would not have any material impact on patients' receipt of services or caregivers' jobs. PPL and DOH told CDPAP patients that their access to care

29

would not change, their eligibility for care would not change, and they would be able to keep their chosen caregivers and continue their current services.

73.    PPL assured caregivers that their eligibility and work would not change. As a PPL formal script guiding PPL's responses to public inquiries put it, denying any potential changes to CDPAP services and caregivers' livelihoods: "The only thing that is changing about CDPAP is that PPL will now be the company doing payroll." Similarly, speaker notes from a pre-transition PPL presentation emphasized: "[L]et's start with what's not changing… If you are eligible and participating in CDPAP, **nothing changes there**. **Same with your current services**. Your fiscal intermediary will change … **but your benefits and services will continue as they always have.** For any personal assistants here with us today, you'll continue to operate under the same requirements you have before. **No changes there."**

74.    Defendants knew these assurances of continuity were false: among many other things, they realized the PPL transition would not be accomplished in the allotted timeframe. And the Defendants were reminded of this more with each passing day.  Yet, instead of backtracking or attempting to warn consumers of what was coming, PPL and DOH persisted in putting out deceptive public statements concealing the impending disruptions to patient care that they knew were about to materialize.

75.    PPL's transition effort was dead in the water from the start, and PPL and DOH knew it. Throughout the transition, PPL tracked granular data regarding enrollment progress. These numbers charted, week by week, the faltering, anemic transition effort.  Instead of leveling with legislators and the public, Defendants concealed the real enrollment numbers behind smokescreens and did not take effective action to mitigate the impending disaster.

30

76.     On January 13, 2025, PPL generated a registration report for CDPAP participants on the patient side, after the much-heralded first week of registrations.  That report captured PPL's actual abysmal progress in enrolling CDPAP members at the critical transition launch:

<u>January 13, 2025, Screenshot from PPL Internal Registration Report</u>:

77.     Similarly, a January 15, 2025, update email from a DOH employee sent to Defendants MCDONALD and BASSIRI noted that after the first week of the transition, out of the more than 240,000 current CDPAP participants, only "112 consumers [patients] and their workers completed their registration"—i.e., less than one tenth of a percent (0.01%) of active CDPAP consumers—had actually been enrolled together with their caregivers.

78.     Weeks into the official transition timeframe, PPL still had managed to register only a negligible number of CDPAP participants. As a health care journalist asked DOH on January 17, 2025: "[I]t seems unlikely that all 240,000 [patients] will be signed up before March 28. Does the state have a comment on its timeline…?"

31

79.   With numbers like these and the transition already the subject of enormous controversy even before the transition had started, the Defendants sought to conceal the true situation from the public. On January 23, 2025, nearing the end of the transition's third week, a DOH spokesperson prepared a (minimally) transparent press statement that contained misleading pablum, but that also would have laid bare how bad the real numbers were:

**Response:** "Our plan to protect CDPAP for New Yorkers is on track to take effect by April 1, and the statewide transition is proceeding as expected. Registration will continue to ramp up significantly as the State and PPL work with more than 30 community-based partners – including 11 independent living centers – to proactively engage CDPAP consumers and caregivers across the state."

**Additional Information:**
- Since registration launched on 1/6, nearly 12,000 CDPAP consumers have either completed or started the registration process, including:
  - Approximately 3,150 have completed registration.
  - Approximately 8,800 have started registration and their process is underway.
- Additionally, since 1/6 PPL's support center has field approximately 30,000 inbound calls to assist consumers.

But even this level of honesty was too much for the Governor's office, which directed DOH not to tell the public how many CDPAP consumers had actually completed registration, but instead to hide that small number behind the much larger, fudged number of those who had "started" the registration process—itself a misleading euphemism for patients and caregivers who had taken any insignificant step at all to interact with PPL:

Thanks ▮ emails crossed, we had a slight correction to our additional information section, we've been asked not to use the granular numbers just yet, Chamber wants to discuss strategy when we are better positioned to do so. However, I have updated the "nearly" to "more than" in our response under the first bullet. Sorry for the multiple emails!

**Response:** "Our plan to protect CDPAP for New Yorkers is on track to take effect by April 1, and the statewide transition is proceeding as expected. Registration will continue to ramp up significantly as the State and PPL work with more than 30 community-based partners – including 11 independent living centers – to proactively engage CDPAP consumers and caregivers across the state."

Additional Information:
- Since registration launched on 1/6, more than 12,000 CDPAP consumers have started the registration process.
- Additionally, since 1/6, PPL's support center has field approx. 30,000 inbound calls to assist consumers.

This decision—to collect and track granular enrollment data, but then conceal the most relevant numbers from the legislature and the public—has persisted throughout the initial CDPAP transition and thereafter.

80.    Two months into the official transition period, PPL continued to lag substantially behind the transition's required milestones. Indeed, by late January, it was so apparent to DOH and PPL leadership that PPL could not meet the April 1 deadline that they were already internally discussing a plan to extend the transition through a "Grace Period" that would accommodate continued enrollment after the official April 1 deadline.  In a similar note of concern from DOH to PPL from late January 2025, DOH informed PPL that "[DOH] needs insight into whether certain [CDPAP] populations are not being reached."

81.    Approaching mid- and then late March, when the transition should have been nearing final completion, PPL's internal enrollment figures showed that it was nowhere close. Indeed, an early March PPL registration report—just weeks from the official transition deadline—showed fewer than 70,000 CDPAP program participants in "Paperwork Complete"

33

status out of the more than 200,000 required to be transitioned, while more than 198,000 were still listed as merely "In Progress."

Screenshot of March 3, 2025, PPL CDPAP Registration Report

| | In Progress | In PPL Review | Paperwork Complete | Total |
|---|---|---|---|---|
| Total | 198,989 | 24,661 | 68,001 | 291,651 |

82.     And by March 15, just weeks from the transition's official March 28 deadline for enrollment and April 1 deadline for transition completion, PPL's data showed only 107,534 patients had been registered.

83.     On March 29, 2025, PPL sent DOH a CDPAP registration update—after the official patient and caregiver registration deadline had passed and just before the April 1 transition completion deadline—that listed more than 97,000 CDPAP patients' registration status as "Not started" and only 46,411 CDPAP Personal Assistants as having enrollment "Paperwork Complete."

84.     PPL and DOH leadership understood the dire ramifications of PPL's lagging transition effort. For example, a talking points document developed for Defendant MCDONALD included the following, clear-eyed prompt: "You keep saying you're 'on track to meet the deadline,' but there are many advocates and lawmakers who say there's no way the state will register everyone in time. **Will this potentially leave tens of thousands of people with disabilities without care after April 1?**" The real answer, which all the Defendants knew but refused to say in public, was yes.

85.     Facing mounting pressure and concerns regarding the efficacy of PPL's transition—including a maelstrom of complaints from patients and caregivers reporting

34

challenges timely enrolling through PPL's dysfunctional processes—PPL and DOH leaders stuck to their strategy of hiding the truth.

86.     PPL and DOH continually presented numbers internally and externally that touted "in progress" or "started" registrations, with the full knowledge that the real numbers of completed registrations were much, much smaller.  In a March 2025 internal exchange about these artificial numbers, a DOH employee asked PPL whether its "in progress" category included program participants who were in fact not "in progress." PPL confirmed this was the case. Specifically, a PPL employee replied to a DOH staffer involved in managing the transition project: "Yes, the 'In Progress' [is] also inclusive of those who **have not started at all yet. Thank you!"**

87.     PPL and DOH knew that this method of presenting registration totals was incoherent and misleading. Indeed, a talking points document prepared for Defendant MCDONALD posed the apt question: "You keep reporting the number of CDPAP users who 'started or completed,' why won't you just give the number of fully completed?" Defendant MCDONALD's template answer merely extended the evasion: "[W]e think giving the number of started or completed is a better representation of where we are in the process. Because, the reality is, once someone starts the registration process, they often complete it quickly…"

88.     Of course, as DOH well understood by this point based on PPL's data and dysfunctional transition efforts, the anodyne assurance that starting a registration attempt with PPL generally led to a quickly completed registration was belied by the experiences of tens of thousands of CDPAP participants who knew otherwise.

89.    They added to these fudged numbers the additional misrepresentation that, in the incorrect words of talking points used by Defendant MCDONALD in late February, "It was always anticipated that this transition would advance at the pace we've seen thus far."

## VII.    January 2025 – April 2025:  PPL's Transition Operation Was a Singular Failure, and Could Not Have Effectuated the Transition in Time to Save the Care of Thousands of Vulnerable New Yorkers

90.    Even if a three-month transition had been theoretically possible, PPL could not have done it.  Operating as a skeletal, mostly work-from-home outfit, PPL simply lacked sufficient administrative staff to handle onboarding huge numbers of people—including the caregivers, who needed full employment paperwork to be onboarded—every day for three months.  In stark contrast to its the explicit promises in its bid submission and the contract's requirements, PPL planned to and eventually did use legions of poorly trained temporary workers to effectuate the transition—not the army of skilled, well-trained, experienced corporate employees it touted to spearhead its transition effort.

91.    PPL acknowledged internally that its proficiency at even smaller transitions was lacking: "If I've learned anything at PPL during transitions," a PPL VP noted, "it's that we short change the staffing to support enrollment."  And unlike those prior transitions that PPL shortchanged, which typically would have numbered in the single-digit thousands of patients, the CDPAP transition required transitioning hundreds of thousands of patients and hundreds of thousands of caregivers on a compressed timeframe.

92.    In keeping with PPL's shortchanged transition staffing, PPL's call-center operation bore no meaningful resemblance to the full-court-press registration effort that it had promised DOH just a few weeks earlier when it signed the contract.  Instead, PPL's call-center

36

temp workers—lacking adequate training, technology, resources, staffing, functioning processes, or knowledge of CDPAP's details—could not and did not efficiently enroll caregivers and patients.

93. Call-center workers suffered from a lack of adequate staffing, dysfunctional processes, and limited guidance from PPL regarding how to handle the complexities of enrollment. These factors contributed to a disastrously slow and inefficient enrollment process, with many thousands of patients and caregivers unable to enroll and left in the lurch.

94. Behind the scenes, during the transition rollout, PPL and DOH stakeholders acknowledged the severe deficiencies of PPL's call-center operations. DOH personnel internally discussed their concerns that PPL's call-center operations lacked adequate resources to manage high-volume CDPAP transition enrollment.

95. Meanwhile, PPL staff criticized the company's sputtering call-center operations. As one PPL staffer wrote to a member of PPL's leadership team during the first week of the transition, "We dont (sic) have enough staff … We need alllll the help." Discussing the chaos of PPL's call center operations, the PPL staffer commented: "Sometimes I think that people shouldn't see how the sausage is made."

96. A January 9, 2025, discussion among PPL leadership about the first week of the transition revealed a series of breakdowns and dysfunction. For example, PPL leadership discussed that those previously enrolled in CDPAP were "mostly unaware about the required transition to PPL." Accordingly, many who received outreach from PPL had no idea who PPL was and, thinking they were receiving spam calls, declined to proceed with enrollment.

37

97.     PPL's call-center temp workers were so unversed in CDPAP that they lacked comprehension of its most basic features, such as that CDPAP caregivers could be family members caring for disabled dependents, a raison d'être of the program.  Similarly, PPL's call center operation seemed unaware of basic requirements of employment law—signing up groups of caregivers as employees without the correct paperwork, telling them that they were fully onboarded, and then having to do it all over again.

98.     Abandoned to PPL's overwhelmed call centers staffed by undertrained temp workers, CDPAP patients and caregivers who tried to enroll faced inordinate wait times for promised callbacks, dropped calls, glitchy and unclear processes, and other obstacles that led to failed enrollments, often despite repeated attempts.

99.     PPL's internal call center data corroborates these complaints, with PPL's statistics showing widespread callback wait times often longer than one or two hours, pervasive dropped calls, and many enrollment attempts that PPL's call center workers were unable to process or resolve, requiring serial registration attempts by patients and caregivers.

100.    For example, PPL's internal call center data from late March 2025, months into the transition, reflected a significant 17 percent general call abandonment rate—meaning the caller hung up or was disconnected before completing their transaction—and especially poor call metrics for non-English speakers, such as average three-hour callback times for Creole speakers and call abandonment rates for Mandarin speakers fluctuating between 60 and 70 percent depending on the day.

101.    When CDPAP stakeholders loudly complained to DOH and the public in February 2025 about "wait times of 30-45 minutes," PPL obfuscated again by telling New York

38

that "people are not waiting 30-45 minutes to get their call answered as we have a 10-minute cut off before the system forces a call back." What this means in plain English is that no one is on hold for 30 minutes because the system simply hangs up after 10 minutes of *hold time* and schedules a callback.  PPL knew, but did not say, that people were *waiting* exactly as long as the public alleged, or longer, to get a callback—an issue that affected more than half of the people who called into the call center.  Indeed, on the day PPL made those representations to DOH, its internal daily report reflected an average wait time of 62 minutes.

102.    PPL also resorted to working in tandem with DOH—without the consent or knowledge of the individuals affected— to raid sensitive personal and healthcare information of CDPAP patients possessed by legacy FIs. PPL then used this information to subject CDPAP patients to what appeared to be an unwanted telemarketing call blitz. This initiative generated frantic concerns from CDPAP administrators and program participants who discovered that, without their knowledge or consent, their detailed personal information had been circulated to an unfamiliar company.

103.    While PPL lacked the time and resources to complete the CDPAP transition or answer the phone when CDPAP patients called, it did have the time and money to pay media consultants and partner with DOH to mount an extensive and deceptive public campaign that sought to discredit people speaking out against the CDPAP transition as part of a "dark money" "misinformation" effort being masterminded by legacy FIs.

**VIII.    January 2025 – April 2025: PPL Withheld Key Facts from CDPAP Caregivers Regarding Pay Rates, and Changes to Pay and Benefits**

104.    PPL knew or was willfully blind to the fact that, contrary to its representations to program participants, it was altering benefits packages and reducing effective pay and benefits for many caregivers. But instead of being transparent about this, PPL sought to conceal this change, refusing to inform caregivers of their official pay rates until *after* they had been enrolled, even as caregivers repeatedly requested this information.

105.    Call center workers who were being asked repeatedly by caregivers for pay rate information and flagging "so many calls" about this were told by one PPL supervisor: "Info like that can't be provided until after they're registered." Similarly, a PPL executive confided in an internal chat thread: "Our pay answers will not give [caregivers] exact pay that is just reality."

106.    While dodging pointed inquiries from concerned caregivers seeking specifics, PPL falsely assured caregivers that it was not changing pay rates and assured patients that they would continue to receive services from the same caregivers if they wished—even as PPL knew or was willfully blind to the fact that it was changing pay rates and that those changes would likely deter caregivers from remaining with CDPAP. As one caregiver who discovered after the fact that PPL had changed her pay rate noted in a complaint: "Shady company had us registered and then let us know we were taking [a] pay rate deduction… Nothing was said upfront…"

107.    Similarly, despite PPL's overarching assurance to caregivers that the CDPAP transition would merely change the fiscal administrator handling payroll, long-standing caregivers in the program found that PPL was not carrying over benefits they had accrued before the transition, and was also unilaterally foisting new healthcare benefit plans on them—whether

or not they wanted or needed them—that PPL used to deduct amounts from caregivers' effective pay rates.

**IX.    The Cover-Up: PPL and DOH Provide Misleading and False Testimony**

108.    The serial false statements made by PPL and DOH regarding the CDPAP transition effort have not ceased even after the transition to PPL. For example, in significant public testimony, and in the face of intense scrutiny from legislators and litigants, PPL and DOH employees have continued to peddle falsehoods regarding the scope and nature of pre-bid award coordination between PPL and DOH.

109.    For example, on August 21, 2025, the New York State Senate convened a public hearing focused on addressing mounting public concerns regarding the CDPAP transition, including concerns regarding endemic disruptions to patient care, caregiver pay, PPL's untimely transition effort, and other operational inefficiencies in PPL's administration of CDPAP. The hearing also featured concerns raised by State Senators regarding the extent of improper pre-bid award communications between DOH and PPL and about misleading projections of cost savings that DOH and PPL had claimed would flow from PPL's administration of CDPAP.

110.    In testimony provided by a PPL representative at this August 2025 hearing, PPL falsely denied that any pre-bid award discussions between PPL and DOH relating to the CDPAP contract had occurred. Under probing questioning from a legislator, PPL's representative testified categorically that PPL had not had any pre-bid-award correspondence with DOH. In fact, the PPL representative who provided this false testimony had *personally participated* in communications with DOH relating to PPL's engagement for the CDPAP contract before the RFP had even issued. At least one high-level PPL employee who witnessed PPL's testimony

alerted the company that its representative had lied at the hearing. After the hearing, PPL had to submit a cursory letter walking back this testimony and acknowledging, without specifically explaining what had happened, that the testimony was inaccurate. Even then, PPL still did not clarify the extent or nature of any pre-bid award coordination or communication between PPL and DOH.

111.    Testimony provided by DOH at the hearing was similarly equivocal and misleading regarding the purported cost savings that DOH and PPL had repeatedly insisted would flow from PPL's administration of CDPAP. For example, a legislator pointedly asked Defendant MCDONALD to square the purported cost savings with apparent increases in the billable reimbursement rates that were being paid to PPL in contrast to those paid to legacy FIs prior to the transition, and asked whether any taxpayer savings remained once these billable rate increases were factored in. Defendant MCDONALD responded that the state expected the savings to materialize, without offering any substantive response regarding the billable rate reimbursement increases paid to PPL on the "back end" despite the lower administrative costs PPL had touted in bidding on the contract. Similarly, a legislator questioned Defendant MCDONALD regarding the basis for his claim that the state remained on track to realize hundreds of millions of dollars in savings from the CDPAP transition. Defendant MCDONALD testified incorrectly that the state's new PMPM of $68.50 per month created "clear savings." He described this new PMPM, which was a new expense for the state, as much lower than prior CDPAP PMPMs, which were paid by a handful of MCOs to legacy FIs for a modest subset of patients from the capitated money the state was *already paying* the MCOs. Defendant

42

MCDONALD also failed to reconcile this narrative with material increases in PPL's billable rate reimbursements raised by the questions he was asked.

112. Similarly, Defendant BASSIRI stated in sworn court filings in December 2024 and January 2025 in lawsuits relating to the CDPAP transition that PPL had attempted no "improper influence" over the RFP process, while leaving out the fact that he had personally vetted PPL (and apparently no other company) as the presumptive sole FI months before the RFP and months before he personally participated in selecting PPL as the sole FI—apparent improprieties in the bid procurement and scoring process that were placed at issue in, and material to, the very litigation in which BASSIRI was providing this testimony. Defendant BASSIRI stated in the same filings that PPL's bid was cheaper than other bids because it would cost the state only about $1 billion in the PMPM, while he was aware the actual cost of PPL's bid would be much higher.

113. To date, neither PPL nor DOH has ever leveled with the public, with New York legislators who have demanded transparency, or with RFP #20524's losing bidders regarding the substantial pre-bid award exchanges between PPL and DOH. Nor has DOH leveled with the public regarding the involvement of DOH decisionmakers, including Defendant BASSIRI, who were involved in the bid scoring and selection process for the RFP in detailed pre-bid award discussions with PPL about the contract or in other irregularities surrounding the bidding process. Instead, PPL and DOH have attempted to obfuscate or outright deny the fact and import of what their internal, non-public communications clearly show, pulling wool over the eyes of the public in order to further deflect scrutiny.

**X.     March 2024 – Present:  The PPL Scheme Caused, and Continues to Cause, Significant Harm to Countless New Yorkers and to American Taxpayers**

114.    Because of PPL and DOH's prolific misrepresentations to the public about the CDPAP transition, large numbers of vulnerable New Yorkers—and their families and caregivers—have suffered and continue to suffer. Because of PPL's botched and dysfunctional transition, CDPAP patients have experienced disrupted care and lost their chosen caregivers—including caregivers who had cared for them for years and with whom they shared strong bonds of trust.

115.    Caregivers have worked without paychecks or abandoned their existing livelihoods after going unpaid under PPL's management. Many caregivers have received materially lower pay under PPL than they previously received for their CDPAP services, or received paychecks from PPL that did not compensate them for all the hours they worked. Many patients lost their ability to continue to receive care from the caregivers of their choosing, or to receive care within the dignified confines of their own homes. Many were shunted into nursing homes or separated from their family caregivers as a result.

116.    Meanwhile, legacy CDPAP fiscal administrators—including many smaller, local firms with few ties to New York politicians but with dense ties to New York's tapestry of communities—abruptly lost lines of business that had been developed over years. Their data was taken, and their patients and caregivers were abruptly displaced by an unknown, out-of-state firm given an inside track by the state.

117.    MCOs involved in operating CDPAP found themselves compelled by PPL to furnish million-dollar upfront cash advances or else be kicked out of the CDPAP system. And

44

once PPL was set up as a monopolist over the CDPAP system, MCOs later found themselves facing rate hikes imposed directly or indirectly by PPL.

118.    Rival bidders trusting in an impartial bid submission process were defrauded by a tainted bid process that benefited PPL, even as PPL skirted core requirements of the contract specifications.

119.    Instead of acknowledging and trying to fix wide-ranging problems in PPL's CDPAP transition, or to transparently address concerning discrepancies in PPL's bid submission and subsequent handling of CDPAP, DOH and PPL sought to conceal their scheme. While they have done so, systemic issues have continued to bedevil the CDPAP program under PPL's control, including ongoing issues involving data security, fraudulent diversion of CDPAP funds, timely payments, and patients' receipt of necessary care.  All the while, PPL receives huge cash payments from public coffers—substantially in excess of what the RFP's strict terms allowed.

120.    Ultimately, the deceptive scheme orchestrated by PPL and DOH imposed hundreds of millions of dollars of additional costs on the Medicaid program that were paid for by federal funds.

121.    An injunction is needed to curb PPL and DOH's long-running, ongoing, and prolific misstatements about the CDPAP transition and program. An injunction is needed to ensure that participants in this critical state program do not continue to be harmed by the disregard for their welfare, and disregard for the truth, evinced by these state officials and private beneficiaries of the public fisc. And an injunction is needed to help restore the status quo as much as possible to help make whole the myriad victims of this scheme.

## COUNT I

### (18 U.S.C. §§ 1035, 371 – Injunctive Relief)
### (Against Defendant PPL)

122.    The United States re-alleges and incorporates by reference Paragraphs 1 through 121 of this Complaint as though fully set forth herein.

123.    Federal law prohibits any person or entity from "knowingly and willfully" engaging in the following conduct "in any matter involving a heath care benefit program": "falsif[ying], conceal[ing], or cover[ing] up by any trick, scheme, or device a material fact; or "making any materially false, fictitious, or fraudulent statements or representations, or mak[ing] or us[ing] any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." 18 U.S.C. § 1035.

124.    CDPAP is a "health care benefit program." 18 U.S.C. § 24.

125.    As described in detail *supra*, PPL engaged in the following conduct:

a.    Falsifying the bid submission and contract to hide the profits it intended to make from a federal health care benefit program—specifically, falsely promising to adhere to the cost structure of the contract, but instead planning to and then taking profits from direct care costs in violation of the contract, which increased the cost of the CDPAP program and the federal governments reimbursements.

b.    Making false or misleading statements or material omissions in the bid submission and contract that misrepresented its ability to carry out the transition according to the contract's specifications and timeline, including on topics about its in-house software, financial readiness to perform the contract, the staff it intended to hire, and the resources it intended to devote to the transition.

46

i. Specifically, PPL misrepresented one of its key technologies, PPL@Home, as a tool that would power the transition, when in reality PPL@Home was untested, was launched for the CDPAP transition, and did not work properly.

ii. PPL represented that it had the financial resources to perform the contract, but in reality planned to use the contract award to raise money to be able to effectuate the transition, and demanded large upfront payments from New York and atypical upfront terms with MCOs in order to be able to have resources to accomplish the transition.

iii. PPL represented that it planned to hire over 1,000 experienced and well-trained New Yorkers to enroll patients and caregivers, and administer CDPAP.  In reality, PPL planned to, and did, hire a legion of largely untrained temporary workers who lacked basic proficiency in CDPAP and who struggled to enroll patients and caregivers.

iv. PPL represented that it was prepared and well-positioned to perform the CDPAP transition based on its experiences in other states, its background knowledge about the managed care space, and its market position.  In reality, PPL knew internally that it had a history of shortchanging its transition resources, and was woefully underprepared in terms of human resources, training, procedures, and tech systems to accomplish the CDPAP transition.

c.  Making false or misleading statements to MCOs about the financial structure of its direct care costs, and about DOH's purported authorization that PPL would be allowed to take costs and profits from the direct care costs and had specifically endorsed PPL's billable rate approach.  Specifically, PPL told MCOs that DOH had approved it paying its costs through its direct care billing, which was forbidden by the contract and which neither DOH nor the contract actually allowed PPL to do.  PPL further presented purported direct care costs to MCOs even though (1) they were not actually direct care costs flowing to caregivers, but were CDPAP administrative costs not permitted to be paid through the direct care billing, and (2) PPL did not know what many of the costs that it presented to MCOs and DOH actually would be.

d.  Making false or misleading statements or material omissions about its pre-bid award communications with DOH.  Specifically, a PPL representative testified under oath at a New York State Senate hearing that it had no pre-bid award contact with New York, when in fact it did.  PPL then attempted to replace that falsehood with a misrepresentation that PPL had engaged in "general" communications about CDPAP with New York—hiding the fact that PPL had presented a specific CDPAP implementation plan to top New York officials before the RFP existed, and that it believed internally that it was the presumptive contract awardee even before the bid period had closed.

e.  Making false and misleading statements about the progress of the transition and the transition's impacts on patient care.  Specifically, PPL participated in

48

repeatedly communicating to CDPAP patients, caregivers, the public, and New York officials that the transition would not affect patient care or caregiver pay, when it knew or was willfully blind to the fact that the transition could not be accomplished on a three-month timeframe and that patient care and caregiver pay would be affected.

f.  Making false or misleading statements or material omissions to CDPAP caregivers regarding changes to their pay rates and benefits packages that would occur during the transition to PPL's management of CDPAP. Specifically, PPL sought to conceal information regarding material changes to pay and benefits from CDPAP caregivers during the transition until after the caregivers had already been enrolled by PPL. PPL also provided false assurances to caregivers that their pay rates would not change.

126.  By reason of the same conduct described herein, PPL has conspired to violate, is conspiring to violate, and is about to conspire to violate 18 U.S.C. § 1035, which conspiracy constitutes a violation of 18 U.S.C. § 371 relating to a health care benefit program.

127.  Upon a showing PPL is committing or is about to commit a Federal health care offense as defined by 18 U.S.C. § 24, the United States is entitled, under 18 U.S.C. § 1345(a)(1), to seek a permanent injunction restraining all such conduct and ordering any other action that the Court deems just to prevent a continuing and substantial injury.

## COUNT II

### (18 U.S.C. §§ 1347, 1349 – Injunctive Relief)
### (Against Defendant PPL)

128.     The United States re-alleges and incorporates by reference Paragraphs 1 through 127 of this Complaint as though fully set forth herein.

129.     Federal law prohibits any person or entry from "knowing and willfully execut[ing], or attempt[ing] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program," if "in connection with the delivery of or payment for health care benefits, items, or services."  18 U.S.C. § 1347.

130.     CDPAP is a "health care benefit program."  18 U.S.C. § 24.

131.     As described in detail *supra*, PPL engaged in the following conduct:

   a.   Falsifying the bid submission and contract to hide the profits it intended to make from a federal health care benefit program.  Specifically, PPL artificially lowered the contract price—and therefore made its bid more attractive—by pretending that it would pay itself exclusively from the $68.50 PMPM, but instead internally recognized that it could play an "hourly rate game" by taking costs and profits from the direct care payments it would receive from MCOs.

   b.   Making false or misleading statements to DOH and MCOs about what its "costs" would be in performing the contract.

   c.   Making false or misleading statements or material omissions in the bid submission and contract that misrepresented its ability to carry out the

50

transition, including on topics about its in-house software, financial readiness to perform the contract, the staff it intended to hire, the resources it intended to devote to the transition:

    i.  Specifically, PPL misrepresented one of its key technologies, PPL@Home, as a tool that would power the transition, when in reality PPL@Home was untested, was launched for the CDPAP transition, and did not work properly.

    ii.  PPL represented that it had the financial resources to perform the contract, but in reality planned to use the contract award to raise money to be able to effectuate the transition, and demanded large upfront payments from New York and atypical upfront terms with MCOs in order to be able to have resources to accomplish the transition.

    iii.  PPL represented that it planned to hire over 1,000 experienced and well-trained New Yorkers to enroll patients and caregivers, and administer CDPAP. In reality, PPL planned to, and did, hire a legion of largely untrained temporary workers who lacked basic proficiency in CDPAP and who struggled to enroll patients and caregivers.

    iv.  PPL represented that it was prepared and well-positioned to perform the CDPAP transition based on its experiences in other states, its background knowledge about the managed care space, and its market position. In reality, PPL knew internally that it had a history of shortchanging its transition resources, and was woefully underprepared in terms of human

resources, training, procedures, and tech systems to accomplish the CDPAP transition.

d. Demanding and receiving upfront payments from the state and from MCOs that were not contemplated by the contract.

e. Demanding and receiving assistance with the transition from the state that was valuable to PPL, but that was not contemplated by the contract.

f. Obtaining and attempting to obtain costs and profits from the direct care costs billed to MCOs—a practice that was specifically forbidden by the RFP and contract.

132. By reason of the same conduct described herein, PPL has conspired and attempted to violate, is conspiring and attempting to violate, and is about to conspire and attempt to violate 18 U.S.C. § 1347, which conspiracy and attempt constitute a violation of 18 U.S.C. § 1349 relating to a health care benefit program.

133. Upon a showing that PPL is committing or is about to commit a Federal health care offense as defined by 18 U.S.C. § 24, the United States is entitled, under 18 U.S.C. § 1345(a)(1), to seek a permanent injunction restraining all future fraudulent conduct and ordering any other action that the Court deems just to prevent a continuing and substantial injury.

**COUNT III**

**(18 U.S.C. §§ 1035, 371 – Injunctive Relief)**
**(Against Defendants MCDONALD and BASSIRI)**

134.    The United States re-alleges and incorporates by reference Paragraphs 1 through 133 of this Complaint as though fully set forth herein.

135.    As described in detail *supra*, the New York Department of Health, through its employees Defendants MCDONALD and BASSIRI, as well as others, engaged in the following conduct:

   a. Making false and misleading statements and material omissions about the financial structure of the bid and contract, and making or using materially false writings or documents with knowledge as to their falsity.  Specifically, the New York Department of Health knowingly signed a contract with PPL that did not reflect the financial reality of the parties' relationship, and that gives the false impression that PPL is compensated only $68.50 per member per month, with the rest of the CDPAP costs going to caregivers.  In addition to the contract itself being a false statement, DOH has also made false statements regarding purported savings in the CDPAP program arising from PPL's operations under the contract.

   b. Making false or misleading statements or material omissions to the public, CDPAP patients, caregivers, and political officials about the progress of the transition, as well as the impact of the transition on consumers and caregivers.  Specifically, DOH repeatedly communicated to CDPAP patients, caregivers, the public, and the State legislature that the transition would not affect patient

care or caregiver pay, when it knew that the transition could not be accomplished on a three-month timeframe and that patient care and caregiver pay would be, was, and is being affected.

c.  Making false or misleading statements or material omissions about the bid process.  Specifically, DOH has represented that the bid process was fair and competitive, when it knows that the bid process was skewed in PPL's favor from the beginning.  DOH also represented that there was no "improper influence" during the bidding period, while leaving out the fact that Defendant BASSIRI himself had vetted PPL as the presumptive sole FI prior to the bidding period even commencing.

136.    By reason of the conduct described herein—which includes the acts described above, as well as the other material acts that DOH and other persons committed in support of those acts—Defendants MCDONALD (in his official capacity as the head of DOH) and BASSIRI (both in his official capacity as the CEO of New York Medicaid and through his personal conduct) have violated, are violating, and are about to violate 18 U.S.C. § 1035, which proscribes knowingly and willfully falsifying, concealing, or covering up by any trick, scheme, or device a material fact, or making any materially false, fictitious, or fraudulent statements or representations in connection with the delivery of or payment for health care benefits, items, or services.  Defendant BASSIRI has specifically falsified, concealed, or covered up material facts regarding DOH's procurement process, pre-RFP communication with PPL, and selection of PPL for the CDPAP contract.  By reason of the same conduct described herein, Defendants MCDONALD and BASSIRI have conspired to violate, are conspiring to violate, and are about to

54

conspire to violate 18 U.S.C. § 1035, which conspiracy constitutes a violation of 18 U.S.C. § 371 relating to a health care benefit program.

137.    Upon a showing that Defendants are committing or about to commit a Federal health care offense as defined by 18 U.S.C. § 24, the United States is entitled, under 18 U.S.C. § 1345(a)(1), to seek a permanent injunction restraining all such conduct and ordering any other action that the Court deems just to prevent a continuing and substantial injury.

## INJUNCTION OR RESTRAINING ORDER AGAINST PPL FUNDS AND APPOINTMENT OF RECEIVER

138.    Upon a showing that PPL is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a Federal health care offense or property which is traceable to such violation, the United States is entitled, under 18 U.S.C. § 1345(a)(2), to an order enjoining such alienation or disposition of property; or for a restraining order prohibiting any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and appointing a temporary receiver to administer such restraining order.

139.    As a result of PPL's violations as described herein and alleged in Counts I and II, the Court should enter orders freezing an amount equivalent to any gross proceeds PPL has obtained, is obtaining, and will obtain from the CDPAP contract and appointing a receiver as contemplated by 18 U.S.C. § 1345(a)(2).  By "gross proceeds," the Government means any amounts beyond the $68.50 PMPM and any amounts that have flowed to caregivers—such as the money PPL obtains as the result of the difference between the amount it makes from the MCOs and the amounts it pays its caregivers.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff United States of America requests of the Court the following relief:

140.    That the Court issue an order, pursuant to 18 U.S.C. § 1345, that Defendants, their agents, officers and employees, and all other persons or entities in active concert or participation with them, are restrained from:

- a.  committing a Federal health care offense, as defined by 18 U.S.C. § 24;

- b.  committing a violation of 18 U.S.C. § 1035 or 1347 or conspiring or attempting to do so;

- c.  making false, fraudulent, or misleading statements related to New York's CDPAP program and/or PPL's transition of, or administration of, that program;

- d.  as to PPL, alienating or disposing of property obtained as a result of the violations described herein;

- e.  as to PPL, prohibiting any person from withdrawing, transferring, removing, dissipating, or disposing of an amount equivalent to any property PPL obtained as a result of the violations described herein;

- f.  as to PPL, appointing a receiver; and

- g.  that the Court order such other relief as it shall deem just and proper.

Dated: June 16, 2026                    Respectfully submitted,

                                        FOR THE UNITED STATES OF AMERICA:

COLIN M. MCDONALD                       BRETT A. SHUMATE
Assistant Attorney General,             Assistant Attorney General, Civil Division
National Fraud Enforcement Division
                                        SARMAD M. KHOJASTEH
JOSEPH NOCELLA, JR.                      Deputy Assistant Attorney General
United States Attorney
                                        BENJAMIN T. HAYES
                                        Counsel to the Assistant Attorney General

                                        LISA K. HSIAO
                                        Acting Director, Enforcement & Affirmative
                                        Litigation Branch

                                        PATRICK R. RUNKLE
                                        Assistant Director

                                        */s/ Shimeng Zhang*
                                        FRANCISCO L. UNGER
                                        SHIMENG ZHANG
                                        Trial Attorneys
                                        Enforcement & Affirmative Litigation Branch
                                        U.S. Department of Justice
                                        450 5th Street, N.W. Suite 6400-S
                                        Washington, D.C. 20530
                                        Phone: (202) 598-5409
                                        Email: Shimeng.Zhang@usdoj.gov