

**U.S. Department of Justice**
Enforcement & Affirmative Litigation Branch

| **Direct Contact** | **Overnight Delivery Address** | **Mailing Address** |
|---|---|---|
| Phone: (202) 532-4723 | 450 Fifth Street, NW | P.O. Box 386 |
| Email: Patrick.R.Runkle@usdoj.gov | Sixth Floor South | Washington, D.C. 20044-0386 |
| Fax: (202) 514-8742 | Washington, D.C. 20001 | |

July 22, 2026

The Hon. Orelia E. Merchant
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     *United States v. Public Partnerships, LLC ("PPL") et al., No. 1:26-cv-03601 (OEM)*

Dear Judge Merchant:

The United States respectfully submits this response letter to the letter filed by defendant Public Partnerships, LLC pursuant to Paragraph III.B of Your Honor's Practice Rules.

This investigation and lawsuit arose from a chorus of complaints—made both directly to the federal government and also widely reported in the media—by persons who were directly and substantially injured by New York's and PPL's fraudulent activity: persons with disabilities throughout the State of New York[1]; advocacy organizations for the elderly and disabled[2]; multiple lawmakers from both political parties[3]; health insurance companies[4]; businesspeople whose businesses were sabotaged by New York and PPL[5]; and even former employees and agents of PPL.[6]

Unable to dispute these facts, PPL resorts to desperately casting this lawsuit as "gross overreach" and "lawfare" against a "political enem[y]." PPL is wrong. The lawsuit against PPL

---

[1] *Jeannot v. New York State*, 762 F. Supp. 3d 217, 222 (E.D.N.Y. 2025).

[2] *Engesser v. McDonald*, No. 25-CV-1689, 2025 WL 2552602 (E.D.N.Y. Aug. 12, 2025).

[3] Sam Mellins, *New York Lawmakers Are Scrutinizing Home Care. We've got Questions*, New York Focus (Aug. 19, 2025), https://nysfocus.com/2025/08/19/new-york-leading-edge-ppl-hearing; Kate Lisa, *Rep. Torres re-ups call for probe of $9B Medicaid home care contract*, Spectrum Local News (Jan. 15, 2025, 10:05 PM), https://spectrumlocalnews.com/nys/central-ny/politics/2025/01/16/rep--torres-re-ups-call-for-probe-of--9b-medicaid-home-care-contract; Rich Calder, *Stefanik calls on feds to ramp up bid-rigging probe of Hochul homecare contract after 'bombshell' email emerges*, New York Post (Dec. 13, 2025, 9:27 AM), https://nypost.com/2025/12/13/us-news/stefanik-calls-on-doj-to-ramp-up-probe-of-hochuls-homecare-program-following-bombshell-email-revelation/.

[4] Letter from Harold N. Iselin, Counsel to New York Health Plan Association, to Deborah Drexler, Public Partnerships LLC, Proposed 2026 Amendment to the CDPAP Reimbursement Rates (Dec. 4, 2025) (available at https://spectrumlocalnews.com/content/dam/News/static/pdfs/nys/717007740_1.pdf).

[5] *Glidedowan, LLC v. New York State Dep't of Health*, 768 F. Supp. 3d 503, 510 (W.D.N.Y. 2025); *Principle Homecare, LLC v. McDonald*, No. 24-CV-07071 (MMG), 2025 WL 622876 (S.D.N.Y. Feb. 26, 2025), aff'd, 158 F.4th 326 (2d Cir. 2025).

[6] Briana Supardi, *"Not enough training": Former PPL workers say poor training plagued CDPAP payroll shift*, CBS6 News Albany (Apr. 28, 2025, 5:38 PM), https://cbs6albany.com/news/local/not-enough-training-former-ppl-workers-poor-training-cdpap-transition-public-partnerships-home-care-doh-new-york-wrgb.

was filed after the Government conducted a year-long investigation that involved reviewing tens of thousands of documents, conducting over 40 witness interviews, and interfacing with the defendants for months. The investigation—and the complaints giving rise to it—conclusively establish that (i) the process by which New York awarded the billion-dollar CDPAP contract to PPL was riddled with misconduct; (ii) New York's and PPL's misconduct extended to the implementation of the contract, which left vulnerable patients without care and caregivers without pay, and resulted in PPL receiving millions of dollars of public money that it was not entitled to receive under its contract with New York, as well as statements made by both PPL and New York to cover up their wrongdoing.

Based on the facts adduced during that extensive investigation, the Government decided to bring suit to obtain relief for vulnerable CDPAP patients, for New York and American taxpayers, and to vindicate the public interest in adherence to federal law.

### 1. Section 1345 Exists to Allow Exactly This Type of Proceeding

PPL's first contention is that 18 U.S.C. § 1345 does not permit a standalone civil proceeding without a parallel criminal proceeding. PPL is incorrect. Section 1345 explicitly authorizes the Attorney General to "commence a civil action" to address certain frauds—exactly what the Government has done here. *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993) ("Actions under section 1345 are civil prosecutions, rather than criminal prosecutions."). The text of the statute, moreover, expressly contemplates that a civil proceeding under 18 U.S.C. § 1345 may proceed *without* a parallel criminal proceeding. Specifically, the statute provides that a proceeding under Section 1345 "is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure." 18 U.S.C. § 1345(b). Congress thus plainly contemplated that some anti-fraud injunction suits may be litigated against entities that are *not* under criminal indictment or part of a parallel criminal proceeding. For its part, PPL does not identify any statutory language to support its argument for limiting Section 1345 to cases with a parallel criminal investigation, nor do either of the cases PPL cites—or any other case of which the Government is aware—adopt such an interpretation.

### 2. The Complaint Easily Satisfies Rule 9(b)

Fed. R. Civ. P. 9(b) provides that allegations sounding in "fraud" or "mistake" be pleaded with particularity. However, "Rule 9(b) does not call for Plaintiffs to plead every conceivable fact about the claims they allege were fraudulent, or to prove its claims at the pleading stage." *Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 568 (S.D.N.Y. 2017). Furthermore, in the case of a conspiracy or scheme, Rule 9(b) requires only a "detailed description of the underlying scheme." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998). "Rule 9(b) does not require that each specific misrepresentation be identified where an ongoing fraudulent scheme is alleged." *State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 237 (E.D.N.Y. 2008) "The purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim and adequate information to frame a response." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 615 (S.D.N.Y. 2013).

The Government has amply met its burden under Rule 9(b) to provide a "detailed description" of the "underlying scheme." Here, the 57-page complaint details PPL's misconduct in extreme detail, with quotations, a timeline, and screenshots of key documents describing how

PPL made its bid look less expensive "on paper," when it planned to (and does) reap a windfall from the billable rate it charged insurance companies, with the funds ultimately coming from American taxpayers. Compl, ¶¶ 37-66. There is literally a PowerPoint (screenshotted in the Complaint (¶43)) where a PPL employee hatched a scheme in July 2024 to make money from the billable rate—a scheme that PPL carried out in a slightly more sophisticated way after it was awarded the contract. *Id*. ¶ 43. These plausible allegations of a plan to keep costs low "on paper," *id*. ¶ 53, while reaping benefits from other income sources refutes PPL's purported inadequacies with the Complaint—it is both substantive fraud (to obtain hidden profits) and it is strongly indicative of the company's scienter (to misrepresent and obscure the actual sources of its income). There are also quotations, a timeline, and screenshots detailing how PPL similarly lied and misrepresented to the public and New York the status of the CDPAP transition. *Id*. ¶¶ 67-107. PPL has undoubtedly been provided "fair notice" and "adequate information" about the nature and circumstances of the fraud the Government has alleged. *Id*.

Furthermore, PPL is incorrect that the Complaint relies on a "purposeful confusion" of PPL's costs and profits. Throughout the Complaint, the Government anchors its allegations in provisions from the bid certification, *id*. ¶ 41; the RFP, *id*. ¶ 60; the executed contract, *id*.; and binding Q&As, *id*. ¶ 39—all of which stipulate that the sole compensation for PPL is the PMPM payment from the state. Contrary to what PPL states in its letter, the Government specifically alleges that PPL shifts costs into the CDPAP direct care service costs in violation of the RFP and the contract. Compl. ¶ 52. It is PPL's position on these issues that attempts to "purposeful[ly] confus[e]" the Court and the public: PPL signed a contract promising that the direct care service costs would "flow[] to the worker," but as the Complaint alleges and as actually happens every day of the week in New York in 2026, some direct care service costs currently flow to PPL and not the caregivers. Regardless of what gloss PPL and New York now want to put on that phenomenon—by illegitimately recharacterizing money flowing to PPL as money flowing to the caregivers—the Complaint's allegations are not only sufficient and plausible, they are correct.

### 3. The Request for a Receiver Is Supported by the Statute and Appropriate

PPL argues that the Government's statutory request for a receiver should be stricken under Rule 12(f), which permits a court in its discretion to strike "impertinent" or "scandalous" matter from a complaint. Putting aside PPL's failure to articulate how it meets the standard for obtaining the "disfavored remedy" of striking material from a complaint under Rule 12(f), the Government's request for a receiver is well supported. *Lipsky v. Commonwealth United Corp*., 551 F.2d 887, 893 (2d Cir. 1976). (holding that a motion to strike under Rule 12(f) should be denied "unless it can be shown that no evidence in support of the allegation would be admissible."). Unlike the one case PPL cites, which relates to a common-law equitable remedy and does not even discuss Rule 12(f), the statute here specifically authorizes a receiver to be appointed "[i]f a person is alienating or disposing of property . . . obtained as a result of . . . a Federal health care offense or property which is traceable to such violation." 18 U.S.C. § 1345(a)(2)(B). PPL's request to strike or dismiss the Government's allegation therefore puts the cart before the horse; if the Government proves, as it intends to, that PPL is obtaining millions of dollars every month as the result of its fraudulent bid and false contract with the State of New York, the Government would be entitled to the appointment of a receiver to administer the Court's order restraining the alienation of those funds. Such receivers have been repeatedly appointed in Section 1345 cases, *e.g.*, *United States v. Khan*, No. 23-24497-CIV, 2023 WL 8711602, at *4 (S.D. Fla. Dec. 14, 2023), and the statute does not speak of any heightened standard that the Government must meet for such relief.

Best,

Patrick Runkle
Assistant Director