

**U.S. Department of Justice**
Enforcement & Affirmative Litigation Branch

| **Direct Contact** | **Overnight Delivery Address** | **Mailing Address** |
| --- | --- | --- |
| Phone: (202) 532-4723 | 450 Fifth Street, NW | P.O. Box 386 |
| Email: Patrick.R.Runkle@usdoj.gov | Sixth Floor South | Washington, D.C. 20044-0386 |
| Fax: (202) 514-8742 | Washington, D.C. 20001 | |

July 22, 2026

The Hon. Orelia E. Merchant
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  *United States v. Public Partnerships, LLC ("PPL") et al., No. 1:26-cv-03601 (OEM)*

Dear Judge Merchant:

The United States respectfully submits this response to the letter filed by defendants Dr. James McDonald and Mr. Amir Bassiri (the "New York Defendants") pursuant to Paragraph III.B of Your Honor's Practice Rules.

### A.  The Defendants' Fraudulent Conduct is Imminent and Ongoing

The New York Defendants' first contention is that the complaint fails to meet the "violating or about to violate" standard required by 18 U.S.C. § 1345, because their misconduct has already ceased. This argument is meritless. The Second Circuit has held that "a conspiracy continues until its aim has been achieved, it has been abandoned or otherwise terminated." *United States v. Salmonese,* 352 F.3d 608, 615 (2d Cir. 2003).  The Complaint plausibly alleges that both the conduct and the effects of the conduct continue and are ongoing.  Compl. ¶¶ 66, 114-21.  The New York Defendants will have an opportunity to prove that some affirmative act has cut off the conspiracy and scheme that the Complaint plausibly alleges, but at this stage they must take the Complaint's allegations as they are.

Additionally, "where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of 'their anticipated economic benefits.'" *Id.* (quoting *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir. 1982)). The Complaint alleges that every hour of home care that PPL bills to Medicaid—and PPL bills 350 million hours per year—is inflated due to the misconduct described in the Complaint. Compl. ¶¶ 37-66. Because the economic benefits of the conspiracy continue to flow to PPL, the conduct alleged in the Complaint is ongoing, and injunctive relief is appropriate and warranted. *Id.*

Moreover, New York's assertion that rates for the program have changed or been altered for 2026 is meritless.  First, the 2025 rates being "superseded" with higher rates (even if true) is not relevant if, as the Complaint plausibly alleges, the 2025 rates (and PPL's entire relationship with New York) were the product of fraud—in that case, PPL is still reaping benefits based on the misconduct. *Mennuti,* 679 F.2d at 1035. Second, whether the conduct is ongoing is a fact-bound issue not cognizable on a motion to dismiss, where the allegations in the Complaint are taken as true—and the Complaint plausibly alleges that the conduct is ongoing.  Compl. ¶¶ 114-21.

### B. The Complaint Alleges a Violation of 18 U.S.C. § 1035

The New York Defendants argue that the Complaint's allegations fail to satisfy the particularity required by Fed. R. Civ. P. 9(b). They are incorrect. As an initial matter, Rule 9(b) may not apply to the Section 1035 claims against the New York Defendants, because they are not specifically alleged to have committed fraud. But even if Rule 9(b) does apply, "Rule 9(b) does not call for Plaintiffs to plead every conceivable fact about the claims they allege were fraudulent, or to prove its claims at the pleading stage." *Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 568 (S.D.N.Y. 2017). Furthermore, in the case of a conspiracy or scheme, Rule 9(b) requires only a "detailed description of the underlying scheme." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

Here, the Government filed a 57-page complaint detailing the New York Defendants' misconduct in excruciating detail—replete with quotations, a timeline, and screenshots of key documents. These detailed allegations easily satisfy Rule 9(b). Indeed, the Government's complaint goes into extensive detail about the underlying scheme and describes with particularity how the New York Defendants violated each element of 18 U.S.C. § 1035, which broadly prohibits false statements and misrepresentations "relating to health care matters":

*First*, the Complaint plausibly alleges that the New York Defendants falsified or concealed a fact or made a false statement. The Complaint is laden with examples of how the New York Defendants concealed facts or made false statements during the bidding process and eventual execution of the PPL contract. Examples include: Bassiri telling a New York state court that the cost of PPL's bid was $1 billion when he knew the true costs were much higher, Compl. ¶ 112; DOH signing a contract with PPL when it knew that PPL had already failed to adhere to the promises in the RFP, *id*. ¶¶ 58-66; and DOH repeatedly falsely reassuring CDPAP caregivers and patients that the CDPAP transition would not have any detrimental impact on current CDPAP patients' services when it knew otherwise, *id*. ¶ 71.

*Second*, the false statements are plausibly alleged to be "in connection with the delivery of or payment for health care benefits, items or services." This element of 18 U.S.C. § 1035(a) is not limited to traditional, mine-run health care fraud, as the New York Defendants argue, but is intended to "combat health care fraud without limitation." *United States v. Cox,* No. 2:05-CR-16, 2006 U.S. Dist. LEXIS 17181, at *17-18 (D. Vt. Mar. 28, 2006). Indeed, *Cox* rejected a remarkably similar argument in a Section 1035 case where a defendant was charged with, among other things, willfully understating the cost of a major hospital renovation in order to avoid regulatory scrutiny. *Id*. Holding that the phrase "in connection with the delivery of or payment for health care benefits, items, or services" should be broadly construed to effectuate its purpose, the court found that Section 1035 is not limited a "particular species of health care fraud." *Id*. The New York Defendants' false statements and conspiratorial acts are alleged to have been designed to effectuate the PPL transition at all costs and to deflect CDPAP stakeholders' attention from what was going on behind the scenes—which was that an out-of-control, favored vendor had run roughshod over the "guardrails" intended to prevent fraud and waste "in connection with . . . payment for" CDPAP services. Compl. ¶ 63. The New York Defendants' statements and conspiratorial acts represent the exact misconduct the statute combats.

*Third*, the false statements are plausibly alleged to be material. As the case the New York Defendants cite holds, "materiality requires only a potentiality of influencing the decisionmaker;

it does not require actual reliance." *United States v. Natale*, 719 F.3d 719, 738 (7th Cir. 2013). The Complaint alleges that the New York Defendants' false statements led to PPL's ultimate selection as NY CDPAP's FI and misled CDPAP patients, caregivers, New York legislators, and the public about the CDPAP transition. Compl. ¶¶ 24-36, 67-89. These statements are obviously—and certainly plausibly—capable of influencing the audiences to which they were addressed. For example, Bassiri's false statement to a New York state court that PPL's bid would cost $1 billion—when he knew it would cost far more because PPL actually kept the "spread" billing system New York said it was doing away with—was obviously material to a "decisionmaker" (*i.e.*, the judge) and was a falsehood or misrepresentation designed to deflect attention away from the misconduct described in the Complaint. Compl. ¶ 112. Another example: the misrepresentations to patients and caregivers were plausibly material to their decisions to sign up with PPL. *Id*. ¶¶ 104-07.

The New York Defendants attempt to graft an additional requirement not found in the statutory language—arguing that the false statements proscribed by Section 1035 must be material to the "payers" of the claims. This limitation is not in the statute and would render key aspects of the statute surplusage, making an offense under Section 1035 indistinguishable from, among other things, health care fraud under 18 U.S.C. § 1347.

*Fourth*, the Complaint plausibly alleges that the New York Defendants acted knowingly and willfully. The Complaint alleges that both Bassiri and his employer, the Department of Health, acted with the requisite mens rea throughout the PPL selection process and the eventual transition. Specifically, Bassiri is alleged to know that the cost of PPL's bid would be much higher than what he stated in a state-court affidavit. Compl. ¶ 112. The Complaint also alleges Bassiri knew that PPL's billing plan was "opportunistic" and that allowing PPL to obtain these revenues would "backfire." *Id*. ¶ 65. DOH staff members sounded the alarm that PPL was attempting to make profits in excess of the "guardrails" in place, but DOH and Bassiri did nothing to stop it. *Id*. ¶ 63. DOH is alleged to have known that the transition would potentially leave tens of thousands of people with disabilities without care after April 1, 2025, but said the opposite. *Id*. ¶ 84. The Complaint also alleges that DOH talking points were purposefully drafted to deceive the public into believing that the PPL transition was going according to plan. *Id*. ¶¶ 86-89. These internal statements, especially when contrasted with the contract and other public statements DOH and PPL have made, adequately allege that Bassiri and DOH acted with the requisite mens rea.

## C. The Complaint Offers a Detailed Account of NY Defendants' Conspiracy in Violation of 18 U.S.C. § 1035

The Complaint describes much more than a mere "allegation of parallel conduct and a bare assertion of conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007). It outlines specifically how Bassiri and the Department of Health conspired directly with PPL and others to disqualify other bidders, falsely bolster PPL's bid score, and ultimately lie to the public about PPL's ability to successfully execute its contract. Among many other things, the Complaint alleges that Bassiri: (1) solicited PPL to be the sole FI,; (2) participated in a sham bid process to select PPL above other bidders; (3) allowed PPL to take more money than allowed under the contract; (4) brushed aside his personal concerns about PPL being "opportunistic" and predicted that the conduct would "backfire"; and (5) misrepresented the true cost of the PPL contract in litigation. Compl. ¶¶ 18-66, 112. These allegations, which obviously required coordination and agreement with PPL, are the essence of a conspiracy.

3

Best,

Patrick Runkle
Assistant Director