**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

PUBLIC PARTNERSHIPS, LLC, *et al*.

*Defendants*.

Case No. 1:26-cv-3601 (OEM)

**DEFENDANT PUBLIC PARTNERSHIP, LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 4

I. NEW YORK ANNOUNCES CONSOLIDATION OF CDPAP. ........................................ 5

A. Self-Directed Home Care Programs and New York's CDPAP. ................................ 5

B. New York Considers Changes to CDPAP. ............................................................ 6

C. New York Issues the RFP. ..................................................................................... 7

D. New York Modifies the Compensation Structure Under the RFP. ........................... 9

II. PPL IS NAMED THE STATEWIDE FI FOR CDPAP. ............................................. 11

A. PPL is Awarded the CDPAP Contract. ................................................................ 11

B. PPL Accomplishes a Historic Transition Despite Former FIs' Legal Challenges and Unlawful Obstruction. ........................................................................ 11

III. DESPITE RECEIVING PRE-LITIGATION EVIDENCE DISPROVING ITS CASE, AND DESPITE NO CRIMINAL INVESTIGATION OR PROSECUTION, DOJ FILES SUIT. ................................ 14

LEGAL STANDARD ................................................................................................ 15

ARGUMENT .......................................................................................................... 16

I. DOJ MISUSES THE INJUNCTION MECHANISM OF 18 U.S.C. § 1345, WHICH IS NOT AVAILABLE WHEN – AS HERE – DOJ HAS DISCLAIMED ANY CRIMINAL MATTER. ........... 16

A. The Text and Structure of 18 U.S.C. § 1345, its Legislative History, Judicial Interpretation, and Common Sense Require a Criminal Case or Investigation. ........ 17

B. Any Attempt by DOJ to Initiate A Criminal Matter Here Would Constitute a Misuse of Parallel Proceedings. ........................................................................ 20

C. DOJ's Attempt to Salvage Its Freestanding Use of §1345 to Obtain Permanent Monetary Punishment without Due Process Fails. ................................................ 21

II. THE COURT SHOULD ABSTAIN FROM ENTERTAINING DOJ'S TRANSPARENT EFFORT TO RELITIGATE FAILED CHALLENGES TO THE STATE'S CDPAP AWARD. ............................... 22

III. DOJ'S CONCLUSORY FRAUD ALLEGATIONS FALL FAR SHORT OF THE GOVERNING PLEADING STANDARD. ..................................................................................... 23

A. DOJ's Allegations that PPL Lied in its RFP Response – Apart from Being Totally False – Fail to Allege Fraud as a Matter of Law. .............................................. 24

B. DOJ's Vague Allegations Regarding PPL's Statements During CDPAP are Legally Defective Under Rule 9(b). ................................................................... 27

C. DOJ Fails to Allege Any Facts Demonstrating Fraudulent Intent. ........................... 30

D. DOJ's Own Allegations Foreclose the Existence of Materiality Under Section 1035. ......................................................................................................... 32

IV. DOJ'S CONSPIRACY CLAIM UNDER 18 U.S.C. § 1349 IS BARRED BY THE INTRA-CORPORATE DOCTRINE. ............................................................................. 33

V. DOJ DOES NOT EVEN ATTEMPT TO PLEAD ANY FACTS IN SUPPORT OF ITS MISGUIDED – AND FACIALLY ILLEGITIMATE – REQUEST FOR A RECEIVER. .......................................... 34

CONCLUSION........................................................................................................................ 35

## TABLE OF AUTHORITIES

Cases | Page(s)

*A&J Staffing, Inc. d/b/a Direct Care v. McDonald*,
Index. No. 912368-2024, (N.Y. Sup. Ct. Albany Cty. Dec. 16, 2024) ....12

*Am. Exp. Travel Related Servs. Co. v. Henein*,
257 B.R. 702 (E.D.N.Y. 2001) .... 23, 25, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).... 15, 32, 33

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).... 15

*Bartels v. Inc. Vill. of Lloyd Harbor*,
97 F. Supp. 3d 198 (E.D.N.Y. 2015) .... 33

*BAT, LLC v. TD Bank, N.A.*,
2018 WL 4693644 (E.D.N.Y. Sept. 28, 2018) .... 30

*Bethphage Lutheran Serv., Inc. v. Weicker*,
777 F. Supp. 1093 (D. Conn. 1991).... 2, 22

*Bethphage Lutheran Serv., Inc. v. Weicker*,
965 F.2d 1239 (2d Cir. 1992).... 23

*Burford v. Sun Oil*,
319 U.S. 315 (1943).... 22

*Burnett v. Halyard Health, Inc.*,
2016 WL 11746743 (N.D.N.Y. Oct. 12, 2016) .... 28

*Capital Solutions, LLC v. Konica Minolta Business Solutions U.S.A., Inc.*,
2009 WL 1635894 (D. Kan. June 11, 2009).... 35

*Capital Source, LLC, et al. v. Goldner Capital Mgmt., et al.*,
2026 WL 1694672 (E.D.N.Y. June 11, 2026) .... 28

*Cappone v. Morrissey*,
2018 WL 4054871 (E.D.N.Y. Aug. 24, 2018).... 24, 30

*Cappone v. Morrissey*,
2018 WL 4055280 (E.D.N.Y. July 27, 2018).... 24

*City Calibration Centers Inc. v. Heath Consultants Inc.*,
727 F. Supp. 3d 332 (E.D.N.Y. 2024) .... 30

*Eckert et al. v. McDonald*,
Index No. 94315-2025 (N.Y. Sup. Ct. Cattaraugus Cty. Jan. 30, 2025) ............................12

*Eden Alpha CI LLP v. Polished.com Inc.*,
763 F. Supp. 3d 270 (E.D.N.Y. 2025) .............................................................................. 16

*Freedom Care LLC*, *v. New York State Dep't of Health, et al.*,
Index No. 161036/2024 (N.Y. Sup. Ct. N.Y. Cty. Nov. 25, 2024) ...................................12

*Green Mountain Holdings (Cayman) Ltd. v. LV 35 Ave. Corp.*,
2023 WL 11984988 (E.D.N.Y. Nov. 17, 2023)........................................................ 4, 34, 35

*Greenspan v. Allstate Ins. Co.*,
937 F. Supp. 288 (S.D.N.Y. 1996) .................................................................................... 27

*Hagigi v. Yukhananov*,
2024 WL 4028333 (E.D.N.Y. Sept. 3, 2024) ..................................................................... 16

*Harris v. Mills*,
572 F.3d 66 (2d Cir. 2009)................................................................................................. 15

*In re Winship*,
397 U.S. 358 (1970)............................................................................................................ 19

*Jeannot v. New York, et al.*,
Case No. 1:24-cv-05896 (E.D.N.Y. Aug. 22, 2024) ............................................................12

*Kaikov v. Kaikov*,
2020 WL 9812923 (E.D.N.Y. Oct. 5, 2020)....................................................................... 27

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)............................................................................................... 27

*Marks Homecare CDPAP v. McDonald, et al.*,
Index. No. 912368-2024, (N.Y. Sup. Ct. Albany Cty. Dec. 6, 2024) ..................................12

*McCrae v. Town of Brookhaven*,
759 F. Supp. 3d 372 (E.D.N.Y. 2024) ............................................................................... 34

*Medicaid Consumers for Continuity of Care, et al. v. McDonald,*
Case No. 1:25-cv-00565 (S.D.N.Y. Jan. 21, 2025) ............................................................12

*Negrete v. Citibank, N.A.*,
237 F. Supp. 3d 112 (S.D.N.Y. 2017)................................................................................. 28

*New York State Ass'n for Retarded Child., Inc. v. Carey*,
727 F.2d 240 (2d Cir. 1984)............................................................................................ 3, 23

*O'Brien v. Nat'l Prop. Analysts Partners*,
936 F.2d 674 (2d Cir. 1991) ..... 15

*Principle Homecare, LLC et al. v. McDonald,*
Case No. 1:24-cv-7071 (S.D.N.Y. Feb. 26, 2025) ..... 12

*Republic of Colombia v. Diageo N. Am. Inc.*,
531 F. Supp. 2d 365 (E.D.N.Y. 2007) ..... 15

*Sait Commc'ns v. Chapman*,
1992 WL 198326 (E.D.N.Y. Aug. 5, 1992) ..... 16

*SHHA, LLC v. Opal Holdings LLC*,
2021 WL 9678663 (E.D.N.Y. Dec. 1, 2021) ..... 27

*Soper v. Simmons Int'l, Ltd.,*
632 F. Supp. 244 (S.D.N.Y. 1986) ..... 30

*Styleline Studios Int'l Ltd. v. Litvack*,
2025 WL 2306738 (E.D.N.Y. Apr. 22, 2025) ..... 15, 34

*United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*,
213 U.S. 366 (1909) ..... 19

*United States ex rel. Ladas v. Exelis, Inc.*,
824 F.3d 16 (2d Cir. 2016) ..... 16

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016) ..... 24, 25

*United States v. Cath. Health Sys. of Long Island Inc.*,
2017 WL 1239589 (E.D.N.Y. Mar. 31, 2017) ..... 4, 33

*United States v. Fang*,
937 F. Supp. 1186 (D. Md. 1996) ..... 2, 16, 18, 22

*United States v. Gonzalez*,
686 F.3d 122 (2d Cir. 2012) ..... 18

*United States v. Jones*,
652 F. Supp. 1559 (S.D.N.Y. 1986) ..... 34

*United States v. Kordel*,
397 U.S. 1 (1970) ..... 17, 20

*United States v. Mahaffy*,
446 F. Supp. 2d 115 (E.D.N.Y. 2006) ..... 20

*United States v. Natale*,
719 F.3d 719 (7th Cir. 2013) ........................................................................................ 32

*United States v. New York City Hous. Auth.*,
347 F. Supp. 3d 182 (S.D.N.Y. 2018)........................................................................ 1, 17

*United States v. Payment Processing Ctr., LLC*,
443 F. Supp. 2d 728 (E.D. Pa. 2006) ............................................................................ 17

*United States v. Petters*,
667 F. Supp. 2d 1043 (D. Minn. 2009)..................................................................... 17, 20

*United States v. William Savran & Assocs., Inc.*,
755 F. Supp. 1165 (E.D.N.Y. 1991) ......................................................................... 17, 21

*Varsames v. Palazzolo*,
96 F. Supp. 2d 361 (S.D.N.Y. 2000)................................................................................ 4

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990).......................................................................................... 16

Statutes

18 U.S.C. § 1035...................................................................................................... 3, 32
18 U.S.C. § 1345.................................................................................................... *passim*
18 U.S.C. § 1347........................................................................................................... 33
18 U.S.C. § 1349..................................................................................................... 33, 34
18 U.S.C. § 3486........................................................................................................... 14
18 U.S.C. § 1341........................................................................................................... 16
18 U.S.C. § 1343........................................................................................................... 16
N.Y. Soc. Serv. Law § 365-f(4-a)...................................................................................... 9

Rules

Fed. R. Civ. P. 9(b) ................................................................................................ 15, 16
Fed. R. Civ. P. 12(b)(1).................................................................................................. 15
Fed. R. Civ. P. 12(b)(6).................................................................................................. 15
Fed. R. Civ. P. 12(f) ...................................................................................................... 15

Regulations

N.Y. Comp. Codes R. & Regs. tit. 18, § 505.28 ................................................................ 9

## INTRODUCTION

In an unprecedented misuse of federal criminal statutes, the U.S. Department of Justice ("DOJ") seeks to use facially invalid allegations of (non-existent) fraud to resuscitate rejected bid protest arguments challenging New York State Department of Health's ("NYSDOH's") 2024 contract award to Public Partnerships LLC ("PPL") as a tool to attack the policy choices of the Administration's political opponents. This maneuver is so brazen – and legally deficient – that DOJ is reluctant to state plainly what it asks this Court to do: (1) countenance the use of criminal remedies where DOJ has disclaimed a criminal case; (2) ignore multiple court decisions upholding the validity of New York's procurement award; and (3) subvert the will of the New York legislature and unwind New York's successful transition to a statewide fiscal intermediary. Perhaps unsurprisingly given its improper purpose, DOJ's case is based on illogical and unsupported accusations of "fraud" that do not come close to satisfying the rigorous pleading standards of the Federal Rules. The Court should dismiss this misguided political project.

**DOJ Cannot Invoke 18 U.S.C. § 1345 Having Disclaimed Any Contemplated Criminal Proceeding.** DOJ repeatedly and explicitly has assured PPL that there is no criminal investigation and no intention by DOJ to pursue any criminal matter against PPL. Indeed, in reliance on this assurance, PPL fully cooperated with DOJ's civil investigation for 15 months, produced tens of thousands of documents and submitted its most senior executives to extensive interviews. The information PPL provided disproves DOJ's misguided theories, but that is beside the point. PPL provided this information in express reliance on DOJ's assurances that this is a civil matter. DOJ's disclaiming of any criminal proceeding forecloses the use of § 1345 as a matter of law.

"18 U.S.C. § 1345 simply provides a procedural vehicle for the Government to enjoin substantive violations of enumerated federal fraud statutes or restrain the fruits of such violations ***during the pendency of a criminal prosecution***." *United States v. New York City Hous. Auth.*, 347

F. Supp. 3d 182, 198 (S.D.N.Y. 2018).[1] DOJ asks this Court to permanently freeze PPL's assets and appoint a receiver. Asset seizure under § 1345 "not followed by a criminal trial would be virtually impossible to justify and would undoubtedly invite serious constitutional challenge." *United States v. Fang*, 937 F. Supp. 1186, 1197 (D. Md. 1996). *Fang* was decided in 1996. DOJ throws out 30 years of good sense and asks this Court to sanction deploying § 1345 as a freestanding civil tool to impose criminal-law punishment without required criminal prosecution safeguards. DOJ appears to believe that it has found a way around these constitutional protections by using a civil case to publicly accuse a defendant of federal crimes and freeze its assets ***with no intention of bringing a criminal case***. DOJ's reading would transform § 1345 from a practical adjunct to criminal prosecution into a sweeping vehicle to thwart constitutional protections. Dismissal is necessary to avoid an unconstitutional application of § 1345.

**DOJ is Attempting to Relitigate Numerous Failed Bid Protests – Indeed to Undo a Lawful State Procurement in Its Entirety – and the Court Should Abstain from Intervening in These Questions of State Policy.** Numerous lawsuits challenging the award to PPL have been dismissed, including four separate bid protests that upheld the legality of the procurement. DOJ's suit is a thinly veiled attempt to champion those same failed arguments here. The Supreme Court's *Burford* abstention doctrine holds that federal courts should "avoid resolving difficult state law issues involving important public policies or avoid interfering with state efforts to maintain a coherent policy in an area of comprehensive regulation or administration." *Bethphage Lutheran Serv., Inc. v. Weicker*, 777 F. Supp. 1093, 1098 (D. Conn. 1991), *aff'd,* 965 F.2d 1239 (2d Cir. 1992). Indeed, the Second Circuit has repeatedly upheld abstentions from cases seeking to question state Medicaid policy, which is precisely what DOJ seeks to do here. *See*, *e.g.*, *Bethphage; see also*

---

[1] Emphasis is added throughout unless otherwise indicated.

*New York State Ass'n for Retarded Child., Inc. v. Carey*, 727 F.2d 240, 245 (2d Cir. 1984). *Burford* abstention requires dismissal of this case in favor of the state court proceedings that already have disposed of challenges to the 2024 contract.

**DOJ's Fraud Allegations Pair Mischaracterization of the State Procurement with Conclusory Labels Unsupported by Any Facts.** There was no fraud here and DOJ's Complaint utterly fails to allege any. Looking to conjure falsity where none exists, the Complaint badly misstates the requirements under "Request for Proposals #20524 New York State Fiscal Intermediary Services" (the "RFP") and the resulting contract between NYSDOH and PPL. DOJ barely quotes the relevant documents, because the actual terms disprove DOJ's case. With no evidence of fraud, DOJ resorts to vague and conclusory assertions, often failing even to allege that statements attributed to PPL were false (because they were not).

Apart from failing to allege fraud with ***any*** detail, let alone the particularity required by Rule 9(b), DOJ does not even attempt to allege scienter. No doubt because senior PPL executives told DOJ in interviews that everything PPL ever said to New York and the public ***was true***, DOJ asserts ***no facts*** suggesting knowledge of falsity. Instead, DOJ confines itself to naked, conclusory assertions insufficient to support a claim for fraud as a matter of law.

DOJ's fraud theory also fails on its face because DOJ affirmatively pleads that PPL's alleged false statements were not material. Materiality is an element of a claim under 18 U.S.C. § 1035 and must be pled with specificity under Rule 9(b). In DOJ's twisted view, PPL made false statements to NYSDOH that NYSDOH knew were false and yet NYSDOH approved PPL's conduct anyway. To be clear, PPL never said anything false to any audience in connection with its 2024 bid or subsequent contract performance. Regardless, by alleging New York knew of PPL's supposedly false statements and has continued to pay PPL under the contract, DOJ has conceded

that materiality is absent here. "[I]f the government regularly pays a particular type of claim in full despite actual knowledge that the requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *United States v. Cath. Health Sys. of Long Island Inc.*, 2017 WL 1239589, at *21 (E.D.N.Y. Mar. 31, 2017).

**DOJ Fails to Allege Any Facts Supporting Its Far-Fetched Request for the Appointment of a Receiver.** "[T]he appointment of a receiver is an extraordinary remedy, which should be employed with the utmost caution and granted only in cases of *clear necessity* to protect plaintiff's interests in the property." *Green Mountain Holdings (Cayman) Ltd. v. LV 35 Ave. Corp.*, 2023 WL 11984988, at *7 (E.D.N.Y. Nov. 17, 2023). Section 1345(a)(2) allows for the freezing of assets, and/or appointment of a receiver, only if DOJ can prove that the purported criminal defendant is "alienating or disposing of property." PPL is the largest employer in the state of New York, administering the Consumer Directed Personal Assistant Program ("CDPAP") in close coordination with NYSDOH. The idea that PPL is poised to "alienate" funds in connection with CDPAP is absurd, which is why DOJ ***does not even attempt to allege it***. Nor does DOJ even attempt to plead that lesser remedies would be insufficient, which is a separate necessary element to obtain a receiver. *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000). The failure to allege necessary elements of a requested remedy is a sufficient basis to strike the remedy under Rule 12(f), or dismiss the claim under Rule 12(b)(6).

Counts I and II of the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

In levelling accusations of ***criminal fraud***, DOJ should be expected to present a clear, accurate, and intelligible factual narrative so the Court can assess whether the claims satisfy the heightened pleading burden of Rule 9(b). Not so here. DOJ's central assertions consist largely of vague generalizations, overheated adjectives, and declaratory asides that are unsupported by

specific factual allegations. PPL suspects this is the case because DOJ is sitting on tens of thousands of documents produced by PPL that disprove its case, as confirmed by PPL executive witness interviews. DOJ instead pleaded this Complaint as if tiptoeing through a factual thicket, levelling fraudulent ***conclusions*** while attempting to avoid the specific evidence it knows rejects those conclusions. That effort failed. DOJ has incorporated by reference, and thus offered for the Court's consideration, a handful of central documents that tell the actual factual story here and allow the Court to reject these claims under Rule 12.

## I. New York Announces Consolidation of CDPAP.

### A. Self-Directed Home Care Programs and New York's CDPAP.

In 2024, New York's increasing Medicaid costs threatened the viability of CDPAP, a critical state Medicaid program serving New York's most vulnerable population.[2] CDPAP is a self-directed home care program pursuant to which a consumer or "patient" hires their own caregivers – often family members or friends – to provide home care services as opposed to receiving services from a traditional home care agency. *See* Compl., ECF 1, ¶¶ 2, 14, 16-17. Because the consumer is the "employer" and caregivers are compensated hourly for the services they provide through the state's Medicaid funds (*id.* ¶¶ 1-2*)* self-direction programs are subject to unique program rules and regulations. For this reason, all states that offer a self-direction program hire a vendor to assist the consumer with the administrative burdens of being an employer – *e.g.*, processing payroll, issuing paychecks, providing benefits, and handling mandatory tax withholdings and remittances. *Id.* ¶ 16. These vendors are known as "fiscal intermediaries" ("FIs").

Self-direction programs, like CDPAP, are not unique to New York; most state Medicaid

---

[2] *See* Hammond, Bill, "Budget Deal Slows Medicaid Growth But Plants Seeds for Future Spending," EMPIRE CENTER, *available at* https://www.empirecenter.org/publications/budget-deal-slows-medicaid-growth-but-plants-seeds-for-future-spending/ (last visited June 30, 2026).

programs have a self-direction program in one form or another. *Id.* ¶ 15. However, unlike all other self-direction programs, before 2025, New York's CDPAP was administered by more than 600 unlicensed and unregulated FIs. *Id.* ¶ 16. This multiple FI model was an extreme outlier. Most states that offer self-direction programs have fewer than three FIs statewide; many states have just one.[3] The hundreds of former FIs in New York operated without any contractual relationship with the State of New York, with minimal oversight, and were incentivized to market CDPAP and drive up enrollment to increase profits.[4] These perverse incentives and the de-centralized structure meant the state agency responsible for overseeing the program, NYSDOH, could not implement even basic controls to manage program growth or prevent fraud, waste, and abuse.[5]

### B. New York Considers Changes to CDPAP.

As of 2016, New York alone accounted for an estimated 40 percent of nationwide Medicaid spending on personal assistance.[6] In 2019, CDPAP spending was $2.5 billion. By 2023, the program accounted for $9.1 billion of New York's Medicaid spending and was on the brink of collapse.[7] In search of a sensible solution, New York consulted with other states, one of which recommended that New York contact PPL to explore consolidating CDPAP administration under a single statewide FI. Compl. ¶ 21. At the invitation of NYSDOH, PPL met with state officials in April 2024, weeks before the legislature implemented changes to CDPAP, and months before DOH would issue the RFP. *Id.* ¶ 26. DOJ does not allege that NYSDOH's consulting with PPL

---

[3] *See* Decl. A. Bassiri, at ¶¶ 8–12, *Freedom Care LLC v. New York State Dep't of Health et al.* Index # 161036/2024 (N.Y. Cty. Sup. Ct.) (Dkt.41).
[4] *Id.*
[5] *Id.*
[6] Bill Hammond, *New York Has Widened Its Lead in Per-Capita Spending on Medicaid*, EMPIRE CENTER, July 31, 2020 *available at* https://www.empirecenter.org/publications/new-york-has-widened-its-lead-in-per-capita-spending-on-medicaid/.
[7] *See* Dan Clark, *New York Begins Transition of $9 Billion Medicaid Program*, TIMESUNION, Jan. 7, 2025, *available at* https://www.timesunion.com/capitol/article/new-york-begins-transition-9-billion-medicaid-20018196.php.

prior to the RFP was improper or in violation of state procurement rules, because it was not.[8]

**C. New York Issues the RFP.**

On April 20, 2024, the New York legislature passed a law requiring the consolidation of CDPAP under one statewide FI selected through a competitive procurement process. *Id.* ¶ 20. Pursuant to this mandate, NYSDOH issued the RFP on June 17, 2024. *Id.* ¶ 24. On August 7, 2024, NYSDOH answered more than 1,300 questions ("Q&As") posed by potential bidders (*id.* ¶ 39) and issued a third amendment ("Amendment #3") (*id.* ¶ 38) which modified the RFP in substantial ways, including altering the compensation structure by adding an additional revenue stream for the single FI. DOJ repeatedly references and, therefore, incorporates by reference the RFP, Q&As, and the Amendment #3. *See* **Ex. A**, Request for Proposals #20524; **Ex. B,** Aug. 7, 2024 Questions & Answers; **Ex. C**, Aug. 7, 2024 Amendment 3 to RFP #20524.

The RFP makes explicit that the single FI (which would ultimately be PPL) would receive two compensation streams for the duration of the contract: (1) a fixed "per member, per month" fee (the "PMPM"), and (2) "separate[]" compensation from the health plans according to an hourly rate the statewide FI would negotiate directly with the health plans, i.e., the "bill rate." *See gen.* Exs. A & C, Sec. 5.4, 6.3. The PMPM and the bill rate each served a different purpose.

**PMPM and Administrative Costs.** Per Section 5.4, the PMPM was a set monthly fee that NYSDOH would pay to the statewide FI to cover the ***administrative*** costs of running the program:

[8] In an attempt to suggest impropriety where none exists, the Complaint repeatedly references "improper pre-***bid award*** communications[.]" Compl. ¶ 109. But DOJ points to no improper pre-bid award discussions, only the lawful pre-***RFP*** discussions between NYSDOH and PPL. *Id.* ¶ 19.

> **1. Administrative Costs**
> - Payment for Administrative Costs will be based on the Contractor's Proposed Per Member Per Month (PMPM) price included in its submitted Attachment F: Cost Proposal. The Proposed PMPM will be an all-inclusive price to complete all FI Statewide Administrative functions through the resulting contract. The Contractor will not be reimbursed separately by NYS or any other entity for any Administrative Services outside of its Proposed PMPM bid under this RFP;
> - FI Administrative Costs will be reimbursed monthly in accordance with the policies in effect on the date the services are rendered.

*See* Exs. A & C at Sec. 5.4. Although the RFP was clear that "the Statewide FI will be reimbursed for ***both*** 1) Administrative Costs; and 2) Direct Care Service Costs[,]" bidders were "***only*** required to propose" as part of their RFP response "a single all-inclusive … PMPM price for the Administrative Services[.]" *Id.* at Sec. 6.3. The RFP did not require bidders to make any representations as to the bill rate, because, as explained in Section 5.4 of the RFP, "Direct Care Service Costs [would] be reimbursed separately from the Administrative Costs … according to the contracts" the statewide FI would negotiate with the health plans and, for Fee For Service ("FFS") members, with the state. *Id.* at Sec. 5.4.

**Bill Rate and Direct Care Service Costs.** The RFP expressly allowed the single FI to use the bill rate to reimburse and compensate the statewide FI for an entire category of costs –"direct care service costs." According to the RFP, direct care service costs would be "compensated separately" according to the terms in the statewide FI's contracts it would negotiate with health plans and other payers:

> The awarded Contractor will not be reimbursed separately for any costs outside of its submitted Attachment F: Cost Proposal and the direct care service delivery compensated separately as identified in Section 5.4: Payment.

> **2. Direct Care Service Costs**
> - The awarded Statewide FI contracted by the Department through this RFP will also be qualified to enter into contracts with the managed care organizations (MCOs) or Local Departments of Social Services (LDSS) to support reimbursement for direct care service delivery by the CDPA. The terms of these contracts shall be consistent with State and federal laws, rules, regulations, and applicable guidance.
> - The Direct Care Service Costs will be reimbursed separately from the Administrative Costs outlined above, according to the contracts with the managed care organization or the Fee For Service (FFS) Fee Schedule for FFS Members.

Exs. A & C, Sec. 6.3, 5.4. The "bill rate" refers to the hourly rate the statewide FI would negotiate

with health plans to "support reimbursement for direct care service delivery by the [caregivers]." *Id.* at 5.4.

The Complaint refers to the difference between the hourly rate paid to the caregivers and the bill rate negotiated with the plans as the "spread." Compl. ¶ 37. Before CDPAP reform, the "spread" included various direct care service costs such as "other payroll and payroll-adjacent costs" and a "benefits package[.]" *Id*. After CDPAP reform, the statewide FI was still obligated to provide the same payroll processing services and benefits and, thus, cover those same costs via the bill rate. *See* Exs. A and C at Sec. 4.1; N.Y. Soc. Serv. Law § 365-f(4-a)(ii); N.Y. Comp. Codes R. & Regs. tit. 18, § 505.28(j)(i). The RFP obligated the single FI to cover, through the bill rate, the costs of:

- "Complying with all applicable social security, workers' compensation, disability and unemployment insurance employer requirements[,]" (Ex. A, at Attachment B)
- "Coordinating [caregiver] benefits, including annual leave, health insurance and employee benefits as applicable," (*id.*);
- "[P]urchasing the required policies" for workers' compensation coverage, disability benefits, and Paid Family Leave benefits coverage (Ex. B, at Q&A 1220); and
- Providing "full and timely payment of wages … per applicable federal and state labor laws, including wage parity and ***overtime*** laws," (Ex. A, at Attachment B).

Thus, the costs associated with "direct care service delivery" and reimbursable via the bill rate included not only the hourly wage paid to the caregivers, but the other costs associated with care delivery, such as employer-side payroll taxes, the cost of workers' compensation insurance, overtime pay, health benefits, and more. *See gen.* Exs. A and B.

Nothing in the RFP, Q&As, or contract prohibited PPL from negotiating a bill rate that was higher than the actual costs of direct service delivery – *i.e.*, that included a "spread."

**D. New York Modifies the Compensation Structure Under the RFP.**

After the RFP was issued, PPL internally expressed concern about the lack of

reimbursement for massive projected upfront transition costs and calculating a competitive PMPM that also properly accounted for the year one costs. *See* Compl. ¶ 43. For example, the July 12, 2024 PowerPoint referenced repeatedly in the Complaint[9] reflects PPL's internal reactions to the scoring criteria announced in the RFP: "the information contained in the Cost Proposal [would] be weighted ***35%*** of a proposal's total score" and the Technical and Administrative Proposals would have a combined weight of 65%. Ex. A at Sec. 8.1. As the PPL Business Development VP acknowledged in his July 12, 2024 PowerPoint, by assigning a substantial weight (*i.e.*, 35%) to the Cost Proposal "[t]he RFP scoring [was] driving" prospective bidders to submit "a recklessly low bid on the FI PMPM." Compl. ¶ 43 (screenshot). In recognition that the RFP scoring incentivized a low PMPM, the PPL VP warned that the administrative costs associated with the transitioning the program "in year one" would be higher and not adequately covered by a lower PMPM, and notes that the single FI might need an additional compensation stream to "make up the delta." *Id.*

PPL's concerns were shared by other bidders. As the Q&As show, prospective bidders understood that the single FI's administrative costs during the transition and the first year of the contract would be an outlier and far exceed the projected costs of administering the program in subsequent years. *See* Ex. B, at Q&A Nos. 711–15, 787. Bidders' concerns about a low PMPM covering year one administrative costs were mooted when NYSDOH issued Amendment #3 on August 7, 2024 (Ex. C) which allowed the single FI to collect additional compensation from the state for the transition period, beyond the administrative PMPM. *See* Ex. C at Sec. 5.4, 6.3. The Amended RFP invited bidders to propose a second PMPM to offset the massive year-one transition costs. *Id.*; *see also* Compl. ¶ 60. The second "all-inclusive PMPM for Initial Transition Costs" was an additional per-member monthly fee the single FI would collect from the State for the first twelve

---

[9] *See* Compl. ¶¶ 42, 43, 55, 62 (referring to July 2024 PowerPoint).

months of the contract. Ex. C at Sec. 6.3. This modification alleviated bidders' concerns, including those expressed by PPL in the PowerPoint, about the financial risks posed by year one costs.

## II. PPL is Named the Statewide FI for CDPAP.

### A. PPL is Awarded the CDPAP Contract.

Guided by the plain language of the Amended RFP and the Q&As, PPL timely submitted its comprehensive three-part bid – comprising its Administrative Proposal, Technical Proposal, and Cost Proposal – on August 21, 2024. Compl. ¶ 25. A true and correct copy of PPL's bid proposal is attached hereto as **Ex. D**. In its Cost Proposal, PPL proposed a PMPM of $68.50 to cover its anticipated administrative costs, (Compl. ¶ 40), and, in accordance with the Amendment, proposed $12.00 as a second all-inclusive PMPM for Initial Transition Costs, (Ex. D at 241). Because the RFP made clear that "direct care service delivery" would be "compensated separately" and "according to the contracts with the managed care organization[s] or the Fee For Service Schedule[,]" (Ex. A at Sec. 6.3; Ex. C. at Sec. 5.4, 6.3), PPL submitted its Cost Proposal without factoring in direct care service costs, (Ex. D at 241).

On September 30, 2024, NYSDOH announced that PPL had been selected as the sole statewide FI for CDPAP and the parties entered into a five-year contract. Upon award, PPL began taking steps to prepare for the transition, including by negotiating an hourly Fee For Service ("FFS") bill rate with the State of New York and an hourly bill rate with the MCOs as contemplated by the RFP. *See* Exs. A and C at Sec. 5.4, 6.3.

### B. PPL Accomplishes a Historic Transition Despite Former FIs' Legal Challenges and Unlawful Obstruction.

Following the award to PPL, various unsuccessful bidders filed bid protest litigation in

state court,[10] and related challenges in federal court.[11] Notably, the allegations levelled by those disgruntled entities (and rejected by the courts) appear to have been repeated nearly verbatim in this case. For example, in *Freedom Care*, the prior FI argued "[t]he contract award to PPL should be invalidated because it was the product of a ***predetermined*** and ***sham bid process***." [12] Here, DOJ alleges "[n]otwithstanding that the New York State Legislature passed a statute requiring a competitive bid process for the selection of the fiscal intermediary, and notwithstanding NYSDOH's repeated public representations concerning the competitive nature of the bid process it established, PPL was ***preselected*** as the winner through a ***sham bid process***." Compl. ¶ 3. Borrowing from the bid protests filed by two other former FIs claiming that "the bidding process for the SFI 'was ***rigged*** from the beginning' for PPL,"[13] DOJ alleges without elaboration that "each stage" of the bid process "was ***skewed*** in PPL's favor." *Id*. ¶ 27. DOJ claims that the "sham bid

---

[10] *See e.g.*, *Freedom Care LLC*, Index No. 161036/2024 (N.Y. Sup. Ct. N.Y. Cty. Nov. 25, 2024) (dismissed action brought by former FI seeking to invalidate contract award to PPL); *Marks Homecare CDPAP v. McDonald, et al.*, Index. No. 912368-2024, (N.Y. Sup. Ct. Albany Cty. Dec. 6, 2024) (dismissed action brought by former FI seeking to invalidate contract award to PPL and reevaluation of petitioner's proposal); *A&J Staffing, Inc. d/b/a Direct Care v. McDonald*, Index. No. 912368-2024, (N.Y. Sup. Ct. Albany Cty. Dec. 16, 2024) (dismissed action brought by former FI seeking invalidation of contract award to PPL and declaration that CDPAP amendment is unconstitutional); *Eckert et al. v. McDonald*, Index No. 94315-2025 (N.Y. Sup. Ct. Cattaraugus Cty. Jan. 30, 2025) (dismissed class action brought by CDPAP participants consumers seeking invalidation of contract award to PPL and declaration that CDPAP amendment is unconstitutional).

[11] *See*, *e.g.*, *Jeannot v. New York, et al.*, Case No. 1:24-cv-05896 (E.D.N.Y. Aug. 22, 2024) (a consumer action seeking to invalidate the CDPAP amendment and prevent its implementation); *Medicaid Consumers for Continuity of Care, et al. v. McDonald,* Case No. 1:25-cv-00565 (S.D.N.Y. Jan. 21, 2025) (action brought by former FI seeking to invalidate the CDPAP legislative amendment); *Principle Homecare, LLC et al. v. McDonald,* Case No. 1:24-cv-7071 (S.D.N.Y. Feb. 26, 2025) (action brought by former FI seeking to invalidate the CDPAP amendment and enjoin its implementation).

[12] *See* Memorandum In Support of Petition at 9, *Freedom Care*, Index No. 161036/2024 (N.Y. Sup. Ct. Nov. 25, 2024)

[13] First Am. Petition, *AJ Staffing*, Index No. 912368, *supra* n. 10, at ¶ 64; *see also* Mem. In Support of Petition, *Marks Homecare*, Index No. 912081, *supra* n. 10, at 3 (describing the "Rigged RFP Process").

process" involved NYSDOH disqualifying bidders for "pretextual" reasons and lazily repeats the allegations asserted by three former FIs in their bid protests – Marks Homecare, Direct Care, and FreedomCare – allegations that were dismissed by the New York courts. *See id.* ¶ 29.

The legal challenges mounted by the former FIs were part of a much larger and well-funded opposition campaign to obstruct PPL's transition efforts and undermine the policy decision of the New York legislature. In fact, it was the former FIs' successful opposition campaign that was to blame for many of the transition issues described in the Complaint, not PPL. In March 2025, NYSDOH was forced to send a series of cease and desist letters to former FIs to put a stop to a misinformation campaign that actively discouraged patients and their caregivers from transitioning to PPL.[14] DOJ fondly refers to these former FIs as the "small- and medium-sized New York business put out of business[,]" (Compl. ¶ 1), refusing to acknowledge that their misinformation campaign directly contributed to many of the transition challenges referenced in the Complaint: the "enrollment logjam" (*id.* ¶ 67), lagging enrollment numbers early on (*id.* ¶¶ 75 –78, 80–81), and overwhelmed call-centers in March (*id.* ¶¶ 94–95, 98–99), as the consumers and caregivers the former FIs discouraged from transitioning to PPL realized they had been deceived and rushed to enroll by the April 1 deadline (*id.* ¶100).

Despite this unlawful obstruction, PPL accomplished one of the largest and most complex Medicaid administrative transitions in Medicaid history on a condensed timeline and despite fierce objection from the outgoing FIs. Although the New York law originally required the single FI to transition or enroll the entire CDPAP population – patients and their caregivers – from their prior

---

[14] *See* "New York State Department of Health Issues Cease and Desist Letters to Certain Fiscal Intermediaries and Licensed Home Health Care Service Agencies for Misleading CDPAP Consumers and Personal Assistants," Mar. 11, 2025 *available at* https://www.health.ny.gov/press/releases/2025/2025-03-11_cdpap.htm (last visited Aug. 4, 2026).

fiscal intermediaries by April 1, 2025, (*id.* ¶ 69), the statutory deadline was effectively extended by this Court to August 2025. *See gen. Engesser et al. v. McDonald,* No. 1:25-cv-01689 (E.D.N.Y.). As of June 2025, two months ahead of the court's extended deadline, NYSDOH reported that PPL had successfully transitioned 98% of the CDPAP population – hundreds of thousands of CDPAP patients and caregivers.[15] The State of New York has realized and publicly touted $1.2 billion in cost savings due to CDPAP reform.[16] Together, New York and PPL continue to enhance and streamline CDPAP to ensure its future operations.

## III. Despite Receiving Pre-Litigation Evidence Disproving Its Case, and Despite No Criminal Investigation or Prosecution, DOJ Files Suit.

On or about February 20, 2025, PPL received a Subpoena Duces Tecum (the "Subpoena") from DOJ's former Consumer Protection Branch and issued pursuant to DOJ's authority set forth in 18 U.S.C. § 3486 of the Health Insurance Portability and Privacy Act ("HIPAA"). **Ex. 1**, Decl. of P. O'Beirne, at ¶ 2. Over the course of fifteen months, PPL voluntarily produced "tens of thousands of documents" and made four senior PPL executives available for witness interviews unlimited in scope or duration. *See* Gov't Ltr., ECF 25, at 2. Despite the written and witness evidence PPL provided to DOJ categorically disproving the allegations of fraud, DOJ filed its Complaint on June 16, 2026 purportedly "after the Government conducted a year-long investigation" into the allegations asserted therein. *Id.* at 1–2. Notably, however, DOJ has not commenced any criminal investigation concerning the matters at issue in this suit and, in fact, does not intend to. Ex. 1 at ¶¶ 9–13.

---

[15] *See* Def. Mem. of Law In Opp. to Pl's Mot. to Am. Preliminary Injunction at 3, *Engesser*, No. 1:25-cv-01689 (E.D.N.Y. June 16, 2025) (ECF 105).

[16] *See* Remarks as Prepared: Governor Hochul Unveils Highlights of the Fiscal Year 2027 Executive Budget: A Stronger, Safer, More Affordable New York. *available at* https://www.governor.ny.gov/news/remarks-prepared-governor-hochul-unveils-highlights-fiscal-year-2027-executive-budget-stronger (last visited August 3, 2026).

**LEGAL STANDARD**

The Court must dismiss a complaint under Rule 12(b)(6) if the plaintiff does not "provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation modified); Fed. R. Civ. P. 12(b)(6). "[A]lthough 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Where a plaintiff fails to allege necessary elements of a requested remedy, the remedy may either be stricken under Rule 12(f) or dismissed under Rule 12(b)(6). *Styleline Studios Int'l Ltd. v. Litvack*, 2025 WL 2306738, at *18 (E.D.N.Y. Apr. 22, 2025).

Courts in this circuit evaluate the argument that "the subject matter is one over which the federal court should abstain from exercising jurisdiction" under Rule 12(b)(1). *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 381 (E.D.N.Y. 2007). "The party asserting subject-matter jurisdiction bears the burden of proving by a preponderance of the evidence that jurisdiction exists." *Id*. And "[t]he district court *must* consider facts outside the pleadings if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." *Id.* (internal citations omitted).

Under Fed. R. Civ. P. 9(b), a party alleging fraud must state the circumstances constituting fraud with particularity in order "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). Thus, even "[w]here pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy

even a relaxed pleading standard." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).[17] Finally, "in ruling on a motion to dismiss, the court may consider the complaint, any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference...and documents possessed or known to the plaintiff and upon which it relied in bringing the suit." *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp 3d 270, 293 (E.D.N.Y. 2025) (citation modified).

## ARGUMENT

### I. DOJ Misuses the Injunction Mechanism of 18 U.S.C. § 1345, Which is Not Available When – as Here – DOJ Has Disclaimed Any Criminal Matter.

Congress added the injunctive relief remedy available under § 1345 to allow for protection against ongoing fraud in connection with an active criminal proceeding. The legislative history is clear on this point and courts uniformly acknowledge this. Indeed, PPL can find no case sanctioning the use of § 1345 where no criminal case is intended. The only court to address this hypothetical noted that DOJ's action in this case "would be virtually impossible to justify and would undoubtedly invite serious constitutional challenge." *Fang*, 937 F. Supp. at 1197. Here, DOJ has repeatedly disclaimed any intent to initiate a criminal proceeding against PPL and yet seeks a permanent injunction freezing PPL's assets. DOJ's § 1345 claims are thus impossible to justify, constitutionally infirm, and must be dismissed.

[17] Courts routinely apply Rule 9(b)'s heightened pleading standard to claims sounding in fraud. *See, e.g., U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016) ("Rule 9(b) principles apply to complaints filed under the False Claims Act."); *Sait Commc'ns v. Chapman*, 1992 WL 198326, at *3 (E.D.N.Y. Aug. 5, 1992) ("A complaint alleging mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 must be pleaded with specificity."); *Hagigi v. Yukhananov*, 2024 WL 4028333, at *4 (E.D.N.Y. Sept. 3, 2024), ("Because allegations of mail, wire, and bank fraud are governed by Rule 9(b) of the Federal Rules of Civil Procedure, they must be pled with particularity.").

### A. The Text and Structure of 18 U.S.C. § 1345, its Legislative History, Judicial Interpretation, and Common Sense Require a Criminal Case or Investigation.

This Court has noted that § 1345 presumes the presence of a criminal investigation. "The legislative history of § 1345 indicates a Congressional concern over the possibility that the consuming public could be victimized by permitting the continuance of a fraudulent scheme ***while a related criminal investigation or prosecution is underway***…." *United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1178 (E.D.N.Y. 1991). Courts consistently emphasize this structural assumption: "18 U.S.C. § 1345 simply provides a procedural vehicle for the Government to enjoin substantive violations of enumerated federal fraud statutes or restrain the fruits of such violations ***during the pendency of a criminal prosecution***." *U.S. v. New York City Hous. Auth.*, 347 F. Supp. 3d at 198; *United States v. Payment Processing Ctr., LLC*, 443 F. Supp. 2d 728, 734 (E.D. Pa. 2006) ("By enacting § 1345, Congress intended to prevent alleged fraud schemes by arming ***prosecutors*** with broad equitable civil injunctive remedies to preserve the status quo ***during an ongoing criminal investigation.***").

DOJ has affirmed this point. In *United States v. Petters*, the respondent argued that the Government's § 1345 proceeding was – under the Supreme Court's holding in *United States v. Kordel*[18] – an improper attempt to use a civil proceeding to obtain evidence for a criminal prosecution. 667 F. Supp. 2d 1043, 1045 (D. Minn. 2009). DOJ argued – and the Court agreed – that § 1345 inherently contemplates a companion criminal proceeding: "The Government also contends that information from the Civil Receivership case is properly shared in the Criminal case, since civil receiverships under 18 U.S.C. § 1345 ***are expressly structured to coordinate with parallel criminal proceedings***." *Id.*

---

[18] 397 U.S. 1, 11 (1970).

The Complaint is devoid of any reference to a criminal investigation or proceeding. Moreover, counsel for DOJ repeatedly assured PPL that there is no grand jury and no intention to initiate a criminal matter. *See* Ex. 1 at ¶ 9–13. DOJ did not mince words, repeatedly stating: "There is no intent to proceed criminally" and "this is not a criminal case." *Id.* PPL cannot find a single authority suggesting that § 1345 can be used to address conduct where – as here – DOJ has disclaimed any intention of initiating a criminal matter.

Indeed, apparently the only published case addressing what DOJ attempts – a permanent injunction under §1345 freezing PPL's assets apart from any criminal proceeding – ***rejected*** the legality of such a maneuver. In *Fang*, the court analyzed the standard for a *preliminary* injunction under 18 U.S.C. § 1345 and, in doing so, emphasized that DOJ's maneuver would be illegal, indeed unconstitutional:

> Although the statute contemplates the possibility of injunctive relief at any stage of the proceedings, as a practical matter any preliminary injunction freezing assets will almost certainly be followed in timely fashion by a criminal proceeding. **A permanent injunction freezing assets not followed by a criminal trial would be virtually impossible to justify and would undoubtedly invite serious constitutional challenge.**

937 F. Supp. at 1197. The consequences of permitting the Government to misuse § 1345 like this would be profound: the Government could level accusations of federal crimes against disfavored people – such as state officials from opposing political parties – without the protective guarantees of the Fifth and Sixth Amendments. "The Fifth Amendment made the right to indictment by grand jury mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings." *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012). In fact, the accusation of criminal misconduct against PPL alone triggers the protections afforded by the Constitution to criminal defendants. The Supreme Court has long recognized that "the accused during a criminal prosecution has at stake

interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." *In re Winship*, 397 U.S. 358, 363 (1970). Here, PPL is accused of criminally defrauding New York, its citizens, and the United States, during the implementation of landmark CDPAP reform. This is not a frivolous accusation and has existential implications for PPL's business and reputation.

It is no surprise that this Government seeks to avoid the check on its power provided by the Constitution, especially the Grand Jury Clause. In seeking to prosecute its political opponents on spurious grounds, the Government has repeatedly either been thwarted by grand juries or has resorted to unprecedented and extreme abuse of that process.[19]

The Court must not adopt a construction that would raise such serious constitutional questions. Where a statute has two interpretations, "by one of which it would be unconstitutional and by the other valid, it is [the courts'] plain duty to adopt that construction which will save the statute from constitutional infirmity." *United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909). That rule is decisive here. DOJ's reading transforms § 1345 from a practical adjunct to criminal enforcement into a sweeping vehicle for imposing punitive restraints in the absence of a criminal case. The Court should reject that construction and preserve the statute's constitutional limits. Dismissal is necessary to avoid an unconstitutional application of § 1345.

[19] *See*, *e.g.*, Mem. Op., at 24, *United States v. James Comey*, No. 1:25-cr-00272(E.D. Va. No. 17, 2025) (Dkt. 191) (concluding "the record points to a disturbing pattern of profound investigative missteps, missteps that led an FBI agent and a prosecutor to potentially undermine the integrity of the grand jury proceeding."); Gov't's Cons. Opp., at 1, *United States v. Michael Rabbit, et. al,* No. 1:25-cr-00693 (N.D. Ill. Aug. 4, 2026) (Dkt. 247) ("There can be no doubt mistakes were made in the prosecution of this case[] [which] is why the United States Attorney's Office has dismissed all charges and is not contesting former Defendants' entitlement to attorneys' fees."); *see also* Rep. of Grand Jury's Failure to Concur in an Indictment, *United States v. Letitia James*, No. 1:25-dm-00013 (E.D. Va. Dec. 11, 2025) (Dkt. No. 1).

### B. Any Attempt by DOJ to Initiate A Criminal Matter Here Would Constitute a Misuse of Parallel Proceedings.

DOJ may attempt to pivot and argue that there could be an eventual criminal matter relating to its investigation. Setting aside whether such a maneuver could save its defective § 1345 claims – the answer should be no – DOJ cannot now transform this investigation into a criminal case without violating constitutional doctrines protecting defendants from such underhanded and deceptive tactics.

For example, defendants are protected from the misuse of parallel proceedings. As addressed in *Petters,* discussed *supra*, the Supreme Court held in *Kordel* that the Government may proceed with parallel civil and criminal proceedings unless there are certain hallmarks of abuse. 397 U.S. at 11. One such category of government "abuse" is where the Government denies or disguises the criminal nature of an inquiry to obtain information used in the eventual prosecution. As the Court explained in *United States v. Mahaffy*:

> *Kordel* hypothesizes that there may be instances in which the Government's conduct reflects such unfairness and want of consideration for justice as to warrant the court's reversal of a conviction or a dismissal of an indictment. For example, ***Kordel suggests that where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution such a departure has occurred.***

446 F. Supp. 2d 115, 124 (E.D.N.Y. 2006). Here, DOJ did not merely fail to advise PPL of a contemplated criminal proceeding. DOJ repeatedly and categorically denied that this was a criminal matter ***and*** denied having any intention to initiate a criminal matter. *See* Ex. 1, at ¶ 9–13. PPL provided thousands of documents and offered its senior executives as witnesses to DOJ in reliance on this express assurance. *Id.* ¶ 4, 6–8. For DOJ to change course now – in a transparent attempt to resurrect its meritless § 1345 claim – would reflect such fundamental unfairness that dismissal of this matter would be independently warranted.

### C. DOJ's Attempt to Salvage Its Freestanding Use of §1345 to Obtain Permanent Monetary Punishment without Due Process Fails.[20]

DOJ points to § 1345's reference to the Federal Rules of Civil Procedure governing a § 1345 action if no intervening criminal case is filed as justification for DOJ's blatant misuse of the statute here. "Congress thus plainly contemplated that some anti-fraud injunction suits may be litigated against entities that are *not* under criminal indictment or part of a parallel criminal proceeding." Gov't Ltr. at 2. DOJ's assertion fails for several reasons.

***First***, the statute directs that a hearing take place "as soon as practicable." 18 U.S.C. § 1345(b). This could easily occur before an indictment is returned. Thus, the language directing that the civil rules control unless an indictment occurs is consistent with an expectation of parallel criminal action. The text merely acknowledges that the statute contemplates injunctive relief against a defendant that is not ***yet*** under criminal indictment.

***Second***, PPL's argument is not that there must be an indictment. Rather, there must be, at a minimum, an actual criminal investigation for DOJ to deploy § 1345, as the cases cited above uniformly note. *U.S. v. William Savran & Assocs., Inc.*, 755 F. Supp. at 1178 ("while a related criminal ***investigation or prosecution*** is underway…"). Here, there is none, and DOJ disclaimed any intent to bring one. In the absence of even a ***contemplated*** criminal investigation, DOJ's § 1345 action clearly fails as a matter of law.

***Third***, and most importantly, DOJ's reference to the statutory text does nothing to support the idea that DOJ can ***permanently freeze and seize monetary assets*** from a § 1345 defendant with no eventual criminal due process. That is the scenario the *Fang* court said was "virtually impossible to justify and would undoubtedly invite serious constitutional challenge." 937 F. Supp. at 1197.

---

[20] PPL joins and incorporates by reference Co-Defendants' argument that injunctive relief is unavailable because Plaintiff has not alleged ongoing or imminent injury. *See* Defs.' Mem. of Law In Support of Mot. to Dismiss at 11–15 (Aug. 10, 2026).

DOJ has disclaimed any criminal matter ever occurring and cannot reverse course now. The use of § 1345 under these circumstances to seek the drastic relief DOJ requests is improper and the claim should be dismissed.

## II. The Court Should Abstain From Entertaining DOJ's Transparent Effort to Relitigate Failed Challenges to the State's CDPAP Award.

Make no mistake: DOJ asks this Court to assist in unwinding the statutorily mandated and state court approved transition to PPL as the sole FI. DOJ repeatedly emphasizes that it brings this case on behalf of the prior FIs (Compl. ¶ 1) and "RFP #20524's losing bidders" (*id.* ¶ 113) and the Complaint asks the Court to issue injunctive relief "to help restore the status quo as much as possible…" (*id.* ¶ 121). That is code for "unwind the CDPAP award and transition." DOJ apparently hesitates to come right out and say that candidly, because of the massive improper overreach their Complaint represents.

There is a clear and persuasive line of cases counseling abstention by federal courts from adjudicating suits that would interfere with state Medicaid policy. In *Bethphage Lutheran Serv., Inc. v. Weicker*, the plaintiff Medicaid service provider challenged "the overall reimbursement rate and the method and rationale by which the reimbursement rate was determined." 777 F. Supp. 1093 at 1098. The district court applied each of the *Burford* factors in assessing whether to abstain: "the degree of specificity of the state regulatory scheme, the necessity of discretionary interpretation of state statutes, and whether the subject matter of the litigation is traditionally one of state concern." *Id.* at 1098 (applying *Burford v. Sun Oil*, 319 U.S. 315 (1943)). The court concluded that each factor weighed in favor of abstention because the administration of Connecticut's state Medicaid program satisfied each factor. *Id.* The court then held that recourse to state courts offered "an adequate remedy" to justify abstention. *Id.*

*Bethphage*'s holding is directly on point. DOJ seeks to challenge both the award of CDPAP to PPL and the reimbursement rates under CDPAP. This case presents the same sort of state Medicaid policy decisions sufficient to warrant abstention in *Bethphage*. Indeed, the losing CDPAP bidders have already availed themselves of the adequate remedy in state court, and lost. As the Second Circuit counseled in affirming the district court's abstention in *Bethphage*:

> [A]bstention under *Burford* was appropriate ***because the subject matter of this case—reimbursement rates under the Medicaid Act—is an area of legitimate state interest***. The Court noted that the Medicaid Act itself requires the creation of a state administrative framework to establish methods and procedures for the procurement of and payment for care and services consistent with efficiency, economy, and quality of care. Thus, Congress has recognized that the establishment and review of reimbursement rates is a legitimate state concern.

965 F.2d at 1244.

For these reasons, the Court "should abstain from deciding [these] question[s], since it would needlessly interfere with New York's administration of its Medicaid system, which has its own procedures for administrative and judicial review of Medicaid rates. …Although the federal government has retained some control over Medicaid regulation, it has left the administration and fiscal responsibilities to the individual states." *N.Y. State Ass'n for Retarded Child., Inc.*, 727 F.2d at 245.

## III. DOJ's Conclusory Fraud Allegations Fall Far Short of the Governing Pleading Standard.

"Baldly asserting the legal elements of a claim for fraud without the necessary factual allegations is not enough to survive a motion to dismiss." *Am. Exp. Travel Related Servs. Co. v. Henein*, 257 B.R. 702, 707 (E.D.N.Y. 2001). Yet that is all DOJ does here. DOJ alleges two categories of supposedly fraudulent statements by PPL: those made in PPL's RFP response and those made after PPL received the award. No matter the category, the fraud allegations fail for at least four reasons: (1) DOJ fails to allege that PPL lacked a present intent to perform the promises

in its RFP response; (2) DOJ fails to plead fraud with the particularity required under Rule 9(b); (3) DOJ fails to allege any evidence of scienter; and (4) in DOJ's own twisted formulation, the statements that DOJ alleges were false were not material.

### A. DOJ's Allegations that PPL Lied in its RFP Response – Apart from Being Totally False – Fail to Allege Fraud as a Matter of Law.

The representations in PPL's RFP response (apart from being truthful and reliable) were for a promise of future performance, which cannot constitute fraud unless there is evidence that PPL lacked a present intention to perform. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016). But DOJ fails to plead ***any*** factual allegations evidencing a lack of intent to perform.

To be clear, PPL stands behind its RFP response and contract performance. But even accepting DOJ's allegations as true, DOJ's factual allegations merely establish that PPL's eventual performance did not exactly match what it committed to do in its bid. This is insufficient to state a claim for fraud. "[W]here a plaintiff alleges that defendant[']s] failure to honor a promise (*i.e.,* contract nonperformance) is the basis of the alleged fraud," the plaintiff must establish "fraudulent intent at the time of contract execution; evidence of a subsequent willful breach cannot sustain the claim." *Cappone v. Morrissey*, 2018 WL 4055280, at *7 (E.D.N.Y. July 27, 2018), *R&R adopted*, 2018 WL 4054871 (E.D.N.Y. Aug. 24, 2018) (citation modified). Because DOJ pleads no facts suggesting that PPL lacked the intent to perform the contract according to the commitments and representations made in its RFP response, the allegations of false representations and certifications in PPL's bid are insufficient and should be dismissed.

**PPL's Bid Representations as to Costs.** The most glaring example of the absence of viable fraud allegations is DOJ's discussion of PPL's proposed PMPM in its successful bid. DOJ

alleges that PPL's $68.50 PMPM and certifications were "false" because it was "clear" from the RFP and contract that the single FI would be entitled to compensation "solely" from the PMPM and "'direct care [service]' costs" included in the billed rate "must flow to the CDPAP caregivers" and could not be used for "cost reimbursement." Compl. ¶¶ 4, 37, 38, 41. But these allegations rest on DOJ's mistaken interpretation of what the RFP and contract required or (in DOJ's view) prohibited.[21] As discussed *supra* Factual Background Sec. I(C), the RFP (i) expressly stated that the statewide FI would be "compensated separately" outside of the PMPM, and (ii) explicitly clarified that this additional compensation would be for "direct care service delivery" and come from the statewide FI's negotiated "contracts with the management care organizations" and the state. *See* Exs. A & C, at Sec. 5.4, 6.3.[22] Thus, PPL never "agree[d]" or "falsely certified" that "it would not be reimbursed by any source other than [its] PMPM[.]" Compl. ¶ 41. All bidders (including PPL) actually certified that they "would not be reimbursed separately … for ***any Administrative Services*** outside of its proposed all-inclusive PMPM … and its all-inclusive PMPM for Initial Transitions Costs[.]" Ex. E at 241.

Setting aside DOJ's mischaracterization of the RFP and PPL's representations in the contract, the Complaint is devoid of any factual allegations suggesting that PPL intended to violate

---

[21] In a tacit concession that DOJ's theory is not supported by the language of the RFP or Q&As, the Complaint carefully avoids quoting the RFP and Q&As. To illustrate, the Complaint references or purports to summarize RFP requirements in 21 instances, but only purports to quote the RFP or Q&As in 4 instances.

[22] In addition to mischaracterizing RFP language, DOJ selectively quotes from Q&As 724 and 708 as supposedly supporting its claim. *See* Compl. ¶ 39. But those Q&As also disprove DOJ's allegations. The quoted Q&As reiterate that PPL's "***administrative*** costs will be compensated via the … PMPM …exclusively[.]" Ex. B at Q&A No. 724; *see also id.* 708. The Q&As ***do not*** state (nor does the RFP or the contract) "that the sole FI would be compensated solely with a [PMPM] payment from the state to compensate the FI for ***all*** costs" or "that a constant, unchangeable PMPM for the five years of the contract would […] be the ***sole*** way that the FI could ***cover its costs***" as DOJ alleges. Compl. ¶ 38.

its supposed agreement or certification that it would not accept compensation beyond the PMPM. This dooms DOJ's theory that PPL submitted a fraudulent PMPM and false certifications.

**PPL's Bid Representations Concerning its Financial Plan**. The threadbare allegations concerning PPL's bid representations concerning its financial wherewithal are similarly insufficient. The Complaint notes that "PPL's bid submission also represented that PPL had 'a financial capital structure plan that supports the startup costs needed for this contract.'" Compl. ¶ 36. DOJ then makes the conclusory assertion that "in reality, PPL knew that its finances were insufficient to launch or competently execute the contract on day one." *Id.*

DOJ's only proffered support for this allegation is a post-RFP response board presentation discussing its financing plan for the initial CDPAP costs. *Id.* But, if anything, that presentation only confirms PPL had an intent to fulfill the various representations it made in its RFP response. *See* **Ex. E**, Oct. 2024 Board Presentation at 5, 12 (explaining capital was needed for staffing, etc.). DOJ does not, because it cannot, allege that the financing PPL successfully achieved was inconsistent with its representation in its RFP response that it had a financial "plan" in place. What is more, the Complaint lacks any claim that the transition was undercapitalized, because it was not. PPL spent tens of millions of dollars obtained through project financing to successfully accomplish the transition, which is exactly what PPL committed to do in its RFP response.

**PPL's Other Allegedly False Bid Representations**. DOJ also points to the representations in PPL's bid about its staffing plan as supposed examples of fraud. Compl. ¶¶ 32-33. DOJ wrongly alleges that the fulfillment of that plan fell short of PPL's prediction. *Id.* ¶¶ 91-95. PPL obviously contests DOJ's characterizations, but nowhere does DOJ allege any facts supporting the charge that PPL had no ***intention*** of following through on the staffing plan as described in the RFP. The same is true for DOJ's allegations about PPL's technology (*id.* ¶¶ 34–

35) and the transition timeline (*id.* ¶¶ 67, 90–91). DOJ simply points to the RFP response and mischaracterizes what occurred as if that were enough to allege a fraudulent lack of any intent to perform. It is not. As this Court routinely holds, "to make out a fraud claim based on a defendant's 'undisclosed intention to breach' a promise, 'proof of such intention must be based on more than a mere showing of non-performance.'" *Kaikov v. Kaikov*, 2020 WL 9812923, at *11 (E.D.N.Y. Oct. 5, 2020) (citation modified). PPL does not concede that it failed to perform on any of these representations. But the fact remains that all DOJ has alleged is failure to perform. The utter absence of any factual allegation that PPL lacked the intention to perform dooms DOJ's fraud allegations.

### B. DOJ's Vague Allegations Regarding PPL's Statements During CDPAP are Legally Defective Under Rule 9(b).

As to the later allegedly false statements made by PPL during the CDPAP contract – to MCOs and the public – DOJ's allegations fail several times over. DOJ does not plead any such false statement with particularity and often fails to allege that the statements were even false. "[To] comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). In other words, it "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *SHHA, LLC v. Opal Holdings LLC*, 2021 WL 9678663, at *5 (E.D.N.Y. Dec. 1, 2021). DOJ does not even attempt to satisfy this burden.

As a threshold matter, DOJ's entire fraud theory fails because fraud allegations "must link the allegedly fraudulent statement to an individual speaker; attribution to a corporate entity or its representative is insufficient." *Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 291 (S.D.N.Y. 1996). DOJ does not attribute a single fraudulent statement to any particular person at PPL. This

is fatal to its fraud claims without further analysis. *See, e.g., Burnett v. Halyard Health, Inc.*, 2016 WL 11746743, at *5 (N.D.N.Y. Oct. 12, 2016) ("Courts in this circuit have been clear that allegations of fraud cannot rely on generalized claims that corporations or their agents made fraudulent statements."); *Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 123 (S.D.N.Y. 2017), *aff'd,* 759 F. App'x 42 (2d Cir. 2019) ("Plaintiffs do not meet the particularity requirements of Rule 9(b) because they fail to identify the alleged Citibank employees who made these allegedly fraudulent statements.").[23]

DOJ offers the Court next to nothing in support of its allegations that PPL knowingly made false statements during performance of the CDPAP contract. The Complaint identifies two audiences to which PPL supposedly made false statements – the MCOs and the public – but never comes close to satisfying 9(b)'s particularity standard. For example, in its eventual fraud count, DOJ alleges that PPL made "false or misleading statements to MCOs" and paraphrases the topics of those supposed false statements as concerning "the financial structure of its direct care costs." Compl. ¶ 125(c). Yet the Court will search in vain through the Complaint for ***any*** allegation that either identifies ***who*** made the statements; ***what*** was specifically said; ***when*** the unidentified individual made the unspecified statements; ***where*** the alleged statements were made or in what manner; or ***how*** the statements concerning "the financial structure of its direct care costs" were false. Any one such failure dooms DOJ's fraud theory. Yet, the Complaint objectively fails to plead ***any*** of these necessary allegations as to ***any*** "fraudulent" statement made by a PPL employee to ***any*** MCO. The allegations therefore must be dismissed. *See*, *e.g.*, *Capital Source, LLC, et al. v.*

---

[23] DOJ may reference its policy not to name individuals when making accusations of criminal fraud. This misses the point completely. DOJ does not make any effort to identify unique individuals by title or position. Indeed, DOJ is intentionally vague and at times appears to attempt to confuse the reader by describing a single PPL employee as if it were two different people. It is this type of vague and impenetrable pleading that Rule 9(b) prohibits.

*Goldner Capital Mgmt. et al.*, 2026 WL 1694672, at *16 (E.D.N.Y. June 11, 2026) (dismissing claim where pleading party failed to "allege a specific fraudulent statement or omission, fails to explain where, when, and by whom they were made, and fails to explain why they were fraudulent when made and how he reasonably relied on them.").

The same is true for the allegedly false statements PPL made to the public. DOJ makes vague reference to PPL's interactions with caregivers and patients with no attempt at particularity. According to the Complaint, "PPL assured caregivers that their eligibility and work would not change," Compl. ¶ 73, and "that it was not changing pay rates and assured patients that they would continue to receive services from the same caregivers if they wished…." *Id.* ¶ 106. But in both instances, DOJ fails to allege the time, location, speaker, and the specific words, and fails to provide the context revealing the statements were false. Even where DOJ purports to quote verbatim statements allegedly made to patients – such as "the only thing that is changing about CDPAP is that PPL will now be the company doing payroll" from an undated script (*id.* ¶ 73) and "[i]f you are eligible and participating in CDPAP, nothing changes there […] Same with your current services" from a separate undated presentation (*id.*) – the Complaint fails to allege who the speaker was, when and where the statements were made, and why or how they were false.

Unwilling or unable to provide more, DOJ fills the gap with baseless, vague and conclusory claims that "Defendants knew these assurances of continuity were false[,]" (*id.* ¶ 74), and "knew … it was altering benefits packages and reducing effective pay and benefits for many caregivers[,]" (*id.* ¶ 104). Apart from being devoid of any evidence that PPL thought any such statement was false, it is well-settled that these vague and conclusory allegations fail to state a claim for fraud as a matter of law. "[D]espite [Rule 9(b)'s] caveat that "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally," courts still have required plaintiffs to

provide some factual basis for conclusory allegations as to state of mind." *Soper v. Simmons Int'l, Ltd.,* 632 F. Supp. 244, 248-49 (S.D.N.Y. 1986).

### C. DOJ Fails to Allege Any Facts Demonstrating Fraudulent Intent.

While Rule 9(b) allows scienter to be alleged generally, that provision "must not be mistaken for a license to base claims of fraud on speculation and conclusory allegations. Accordingly, [DOJ] must allege ***facts*** that give rise to a ***strong inference*** of fraudulent intent." *Am. Exp. Travel Related Servs. Co. v. Henein*, 257 B.R. 702, 706 (E.D.N.Y. 2001). *See also Cappone*, 2018 WL 4055280, at *7 (dismissing fraud claims where "there are no allegations at all in the Complaint about [defendant's] state of mind, other than a single conclusory allegation[;] that is insufficient."). Even if DOJ had managed to allege specific actionable false statements (it has not), it must separately point to ***facts*** that PPL believed it was saying false things, not just DOJ's overheated rhetoric. The Complaint offers no such facts, only conclusory allegations, and thus its fraud claims fail for this independent reason.

"[DOJ's] allegations of scienter scattered throughout the [Complaint] are conclusory. …These allegations include no factual detail at all with respect to mental state. …They simply urge that the [PPL] 'knew.' Such conclusory assertions are not entitled to the presumption of truth and they cannot by themselves establish fraudulent intent." *BAT, LLC v. TD Bank, N.A.*, 2018 WL 4693644, at *7 (E.D.N.Y. Sept. 28, 2018). The Complaint "simply states in conclusory fashion that [PPL] knew its statements were false without alleging facts as to how [PPL] and/or its representatives possessed such knowledge." *City Calibration Centers Inc. v. Heath Consultants Inc.*, 727 F. Supp. 3d 332, 364 (E.D.N.Y. 2024):

**Statements to Consumers**. "PPL knew or was willfully blind to the fact that, contrary to its representations to program participants, it was altering benefits packages and reducing effective pay and benefits for many caregivers." Compl. ¶ 104. This is a naked argumentative assertion with

no facts supporting an inference fraudulent intent, no reference to a PPL employee, document, or witness.

**Transition Timeline.** "PPL's transition effort was dead in the water from the start, and PPL and NYSDOH knew it." *Id.* ¶ 75. No evidence, no facts. No reference to a PPL employee, document, or witness. Put aside that it is a matter of public record that PPL succeeded in completing the transition in the timeframe prescribed by court orders (which had extended the original deadline for reasons outside PPL's control). Overwrought assertions that PPL knew the transition was "dead in the water" do not satisfy Rule 9(b). DOJ should know this.

**PPL's PMPM**. Here DOJ's Complaint is at its most nonsensical. DOJ alleges that PPL's proposed PMPM included in its RFP response was "fraudulent" (*id.* ¶ 42), "artificially low" (*id.* ¶ 53), a "sham figure" (*id.* ¶ 55), and a "fig leaf of a pretend" (*id.* ¶ 56). One would expect such rhetoric to be supported with allegations explaining how PPL's PMPM was purportedly false. DOJ utterly fails to do so. This is partly because it was a proposed contract price to which NYSDOH agreed and pursuant to which PPL has been performing. It is not the kind of fact that can be "false."

What DOJ appears to be implying is that PPL did not believe in its PMPM, meaning PPL did not believe that it could deliver the CDPAP contract at that price. Yet DOJ cannot even bring itself to make that allegation directly, let alone support it with any ***asserted facts*** suggesting that PPL "knew" there was anything untrue about its proposed PMPM.

That is because DOJ's misguided assertion is based on a self-evidently faulty premise. Although DOJ claims that the RFP prohibited the single FI from receiving compensation from sources other than the PMPM, (*id.* ¶¶ 37–40), DOJ does not even attempt to allege that PPL ***knew*** that its PMPM would be "the sole way that [it] could cover its costs and earn a profit" and thus might be too low (*id.* ¶ 38). PPL had no such understanding ***because the RFP expressly stated the***

***opposite***. *See* Factual Background Sec. I(C) *supra*.

**D. DOJ's Own Allegations Foreclose the Existence of Materiality Under Section 1035.**

DOJ's claim under § 1035 should be dismissed for the additional reason that DOJ affirmatively pleads its way out of materiality, which is a required element. To allege a violation of 18 U.S.C. § 1035, DOJ must allege that PPL knowingly and willfully "falsifie[d], conceal[ed], or cover[ed] up … a ***material*** fact," or made a "***materially false, fictitious*** or ***fraudulent*** statement[] or representation[]." 18 U.S.C. § 1035 (1)–(2). Although DOJ repeatedly recites the legal conclusion that PPL's alleged misrepresentations were "material," (Compl. ¶ 3),[24] (i) legal conclusions are not accepted as true, *Iqbal*, 556 U.S. at 678; and (ii) the ***only*** facts DOJ alleges concerning materiality defeat this legal conclusion rather than support it.

Desperate for allegations suggesting NYSDOH was somehow complicit in PPL's alleged scheme, DOJ inadvertently defeats its own claim under § 1035 by pleading facts establishing that PPL's alleged false statements were not material. False statements are material if they "ha[ve] a natural tendency to influence, or [are] capable of influencing, the decision of" the health care benefit program." *United States v. Natale*, 719 F.3d 719, 737 (7th Cir. 2013) (finding plain error where district court failed to instruct jury that the false statements must be material although affirming conviction on other grounds).

According to DOJ's own allegations, NYSDOH supposedly knew that (i) PPL was unable to complete transition "on the contractually prescribed three-month timeline" "before the contract was signed" and signed it anyway (Compl. ¶ 5); (ii) PPL was undercapitalized and required "large upfront payments from NYSDOH" and, despite contrary language in the RFP, made those advance payments to PPL anyway (*id.* ¶¶ 59–60); (iii) PPL was also extracting "upfront payments" from

[24] *See also* Compl. ¶¶ 5, 31, 125(b), (d), (f), and 131(c).

the MCOs not contemplated by the contract and did nothing to stop it (*id.* ¶ 61); and (iv) PPL was flouting alleged prohibitions "in the RFP and contract about PPL not making profits form the billable rate" (*id*. ¶¶ 62, 64), NYSDOH internally disagreed with PPL's approach (*id.* ¶¶ 63, 65), but never enforced "the limitations in the RFP and contract" against PPL (*id.* ¶¶ 62, 66).

By alleging NYSDOH had knowledge of the falsity, "stood idly by[,]" took no "remedial action" and continued to pay PPL under the contract, (*id.* ¶ 58), DOJ has defeated the materiality element of its own claims. "[I]f the government regularly pays a particular type of claim in full despite actual knowledge that the requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *U.S. v. Cath. Health Sys. of Long Island Inc.*, 2017 WL 1239589, at *21.

## IV. DOJ's Conspiracy Claim Under 18 U.S.C. § 1349 Is Barred by the Intra-Corporate Doctrine.

DOJ's tacked-on claim for conspiracy under 18 U.S.C. § 1349 fails for the straightforward reason that PPL cannot conspire with itself. "Under the intra-corporate conspiracy doctrine, officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 216–17 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 F. App'x 54 (2d Cir. 2016) (citation modified). Although DOJ pleads the legal conclusion that "PPL has conspired and attempted to violate, is conspiring and attempting to violate, and is about to conspire and attempt to violate 18 U.S.C. § 1347," Compl. ¶ 132, the Complaint does not contain any facts to support this legal conclusion. Legal conclusions are not accepted as true, even at the motion to dismiss stage. *Iqbal*, 556 U.S. at 678.

Here, the only parties to the conspiracy would be the PPL officers and employees referenced in the Complaint. Because they are all employees of a single corporate entity, *i.e.*, PPL,

and are each "acting in the scope of his or her employment," they are "legally incapable of conspiring with each other." *McCrae v. Town of Brookhaven*, 759 F. Supp. 3d 372, 396–97 (E.D.N.Y. 2024). There are no factual allegations that would support a conspiracy. DOJ's claim under § 1349 therefore fails, and because DOJ cannot identify any co-conspirators, the claim should be dismissed with prejudice.

### V. DOJ Does Not Even Attempt to Plead Any Facts in Support of Its Misguided – and Facially Illegitimate – Request for a Receiver.

DOJ's request for appointment of a receiver reads as an afterthought and, regardless, should be stricken under Rule 12(f) because DOJ has not even attempted to allege facts that would warrant such a drastic remedy. Appointment of a receiver "is an extraordinary remedy" that must be "employed cautiously and granted only when clearly necessary to protect plaintiff's interests in the property." *Green Mountain Holdings (Cayman) Ltd. v. LV 35 Avenue Corp.*, 2023 WL 11984988, at *2 (E.D.N.Y. Nov. 17, 2023) (Merchant, J.). DOJ is entitled to this drastic relief only against a defendant who "is alienating or disposing of property, or intends to alienate or dispose of property" traceable to the alleged offense. 18 U.S.C. § 1345(a)(2); *United States v. Jones*, 652 F. Supp. 1559, 1560 (S.D.N.Y. 1986). And where relief is unavailable as a matter of law on the facts pleaded, courts in this Circuit strike it under Rule 12(f). *Cf. Styleline Studios*, 2025 WL 2306738, at *18 ("[A]mple authority permits striking prayers for punitive damages where such relief is unavailable as a matter of law.").[25]

As discussed *supra* Argument Sec. I(C), DOJ asks this Court to permanently freeze and

---

[25] In the alternative, PPL moves for dismissal of the receivership request under Fed. R. Civ. P. 12(b). As this Court has acknowledged, "there is "divided case authority" on whether striking or dismissing a punitive damages request is the better course of action," even though "many courts have stated that because "punitive damages are a form of damages, not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is 'procedurally premature.'" *Styleline Studios*, 2025 WL 2306738, at *18.

seize PPL's monetary assets through a receivership. That remedy demands, at a minimum, allegations of "imminent danger of the property being lost, concealed, injured, diminished in value, or squandered." *Green Mountain*, 2023 WL 11984988, at *4 (citation modified). DOJ pleads none. Indeed, DOJ does not even attempt to allege that PPL "is alienating or disposing of… or intends to alienate or dispose of [its monetary assets]" because ***no such evidence exists***.

DOJ asks the Court to enter orders "freezing an amount equivalent to … any amounts beyond the $68.50 PMPM and any … money PPL obtains as the result of the difference between the amount it makes from the MCOs and the amounts it pays the caregivers." Compl. ¶ 139. That "difference" is spent on the caregivers' overtime pay, healthcare benefits, holiday pay, and paid time off. Thus, DOJ inexplicably asks the Court to freeze ***hundreds of millions of dollars*** that are either directly flowing to or directly benefiting CDPAP caregivers. Because DOJ pleads no facts showing that PPL is dissipating, or intends to dissipate, assets traceable to the alleged offense, it has "not made an adequate showing" for this extraordinary remedy, and "[n]o clear necessity is present here." *Green Mountain*, 2023 WL 11984988, at *4, *7. *See Capital Solutions, LLC v. Konica Minolta Business Solutions U.S.A., Inc.,* 2009 WL 1635894, at *9 (D. Kan. June 11, 2009) (refusing receivership where the claimant "fail[ed] to allege any reasons, let alone any compelling equitable reasons or extreme circumstances, such as imminent danger that its property will be lost, concealed or diminished in value, which would warrant the appointment of a receiver.").

## CONCLUSION

For the foregoing reasons, PPL respectfully requests that the Court dismiss Counts I and II of the Complaint with prejudice.

Dated: August 10, 2026

Respectfully submitted,

*s/ Philip J. O'Beirne*

Philip J. O'Beirne*
POBeirne@steinmitchell.com
Melissa S. Fox (NY Bar 4507729)
MFox@steinmitchell.com
Samantha P. Christensen*
SChristensen@steinmitchell.com
Nicholas W. Cannon*
NCannon@steinmitchell.com
**STEIN MITCHELL BEATO & MISSNER LLP**
2000 K Street, N.W., Suite 600
Washington, D.C. 20006
(202) 737-7777 (telephone)
(202) 296-8312 (fax)

*Counsel for Defendant Public Partnerships, LLC*

* admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this 10th day of August 2026 via electronic mail upon all counsel of record as reflected in the below Service List.

*s/ Philip J. O'Beirne*
Philip J. O'Beirne

*Counsel for Public Partnerships LLC*

SERVICE LIST

Patrick R. Runkle
Patrick.R.Runkle@usdoj.gov
Francisco L. Unger
Franscico.L.Unger@usdoj.gov
Shimeng Zhang
Shimeng.Zhang@usdoj.gov
**U.S. Department of Justice**
Civil Division
P.O. Box 386
Washington, DC 20044

Michael S. Blume
Michael.Blume@usdoj.gov
**U.S. Attorney's Office**
Eastern District of New York
271 Cadman Plaza East
Brooklyn NY 11201

*Counsel for United States*

Arun G. Rao
ARao@igint.com
**Mayer Brown LLP**
1999 K Street NW
Washington, DC 20006

Gina M. Parlovecchio
GParlovecchio@mayerbrown.com
**Mayer Brown LLP**
1221 Avenue of the Americas
New York, NY 10020

*Counsel for Defendants McDonald and Bassiri*

Guy Petrillo
GPetrillo@pkbllp.com
Emma Susanne Spiro
ESpiro@pkbllp.com
**Petrillo Klein & Boxer LLP**
655 Third Avenue
New York, NY 10017

*Counsel for Defendant Bassiri*