# Exhibit B

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of<br><br>FREEDOM CARE LLC,<br>Petitioner,<br><br>for Judgment Pursuant to CPLR Article 78<br><br>- against -<br><br>THE NEW YORK STATE DEPARTMENT OF HEALTH; JAMES V. MCDONALD, in his official capacity as Commission of the New York State Department of Health; and PUBLIC PARNTERSHIPS LLC,<br><br>Respondents. | Index No. 161036/2024<br><br>(Hon. Verna L. Saunders)<br><br>IAS Part 36<br><br>**SUPPLEMENTAL AFFIRMATION OF AMIR BASSIRI** |

**AMIR BASSIRI**, pursuant to New York CPLR 2106, hereby affirms under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the following is true, and I understand that this document may be filed in a proceeding in a court of law:

1) As set forth in my original affirmation submitted in this matter on December 24, 2024 ("12/24/24 Bassiri Aff."),[1] I am the Deputy Commissioner of the Office of Health Insurance Programs ("OHIP") at the New York State Department of Health (the "Department" or "DOH") and I have been the New York State Medicaid Director since April 2022. As such, I am fully familiar with the Consumer Directed Personal Assistance Program ("CDPAP") at issue in these proceedings.

2) I submit this supplemental affirmation in opposition to the Petition and Petitioner's application for a preliminary injunction seeking, among other relief, to enjoin the Department from

[1] NYSECF #41.

implementing the award of a contract for the provision of statewide fiscal intermediary ("FI") services to Public Partnerships LLC ("PPL") pursuant to Request for Proposal ("RFP") #20524, and in support of State Respondents' Answer to the Petition. Specifically, I submit this supplemental affirmation to address certain new allegations or assertions set forth in Petitioner's Reply papers filed on January 7, 2025.

I. THERE IS NO ACTUAL OR PERCEIVED CONFLICT OF INTEREST BASED UPON PCG'S PURPORTED MINORITY OWNERSHIP INTEREST IN A PPL PARENT COMPANY

3) In its Reply, Petitioner makes baseless assertions regarding the relationship between DOH and Public Consulting Group ("PCG"), one of thousands of vendors or contractors utilized by DOH, and then leaps to the equally baseless conclusion that PPL should have been disqualified due to an actual or perceived conflict of interest based on such relationship.

4) First, DOH has over 4,000 employees, of which approximately 2,307 work within the Medicaid program. To assist in DOH's operations, DOH utilizes contract workers to fulfill certain roles. SSO, a PCG subsidiary, is one of the staffing companies DOH has used to fill various roles.

5) Only about 250 SSO employees work with DOH in the Medicaid program. Thus, the number of employees who were subcontracted from SSO, as relied upon by Petitioner, is insignificant. With the exception of SSO staff in our health plan contracting division who assist in email distribution of policies to managed care plans and contract managers, or complaint staff listening to weekly calls with health care plans, no SSO staff are involved with CDPAP. More importantly, none of the SSO employees working within DOH were involved in the development of RFP #20524 or its amendments, or the review and evaluation of the bid proposals and none had

access to the bid proposals or evaluation documents. The Department greatly appreciates SSO staff and recognizes the value they bring with their experience and assistance. However, SSO staff are not decision or policy makers within DOH and such duties are only handled by State employees.

6) With respect to the four individuals identified specifically by Petitioner in its Reply papers, *i.e.*, Brian Watkins, Diana Halstead, Jason Chura, and Alicia Segura, none worked on the development of RFP #20524 or its amendments, or the review and evaluation of the bid proposals. As described by Mr. Watkins in his Affirmation, he worked for a period of time in the Technical Assistance Center, supporting the Long-Term Care Unit within DOH. Watkins Aff. ¶ 3. Regardless of Mr. Watkins' estimate of how many SSO employees may have worked in his Unit "at certain times," none worked on the development of RFP #20524 or its amendments, or the review and evaluation of the bid proposals.

7) As to Petitioner's assertions regarding PCG's contracts with DOH, I note that in my role as Medicaid Director, I oversee the State's largest public health insurance program supporting nearly 8 million New Yorkers at over $100 billion annually. Currently, DOH has thousands of active contracts. The contract values and durations vary, with the value of many individual contracts exceeding the $500M aggregate ascribed by Petitioner to PCG. For example, DOH has entered into several contracts with Maximus US Services, Inc., including consulting contracts in amounts exceeding $1.5 billion.[2]

8) PCG's active contracts with DOH total about $255 million with ten-year terms. As

---

2 https://wwe2.osc.state.ny.us/transparency/contracts/contractresults.cfm?a=DOH01&ac=&v=Maximus&vo=B&cn=&selOrigDateChoiceOperator=0&txtOrigFromDate=&txtOrigToDate=&selCTDateChoice=0&selCTDateChoiceOperator=0&txtCTFromDate=&txtCTToDate=&selContractAmountChoice=0&txtContractAmount1=&txtContractAmount2=&b=Search

these totals reference the entire duration of the contracts, the amount paid to PCG each year fluctuates, but it averages a little over $25 million—which is approximately 0.025% of overall yearly Medicaid spending. The suggestion that such contractual relationship signifies that PCG has "sway" or "influence" over CDPAP, including DOH's selection of the Statewide FI mandated by the CDPAP Amendment, is untrue and simply absurd.

9) Also untrue is Petitioner's assertion that PCG or PPL somehow selected FIs to participate in CDPAP pursuant to the procurement requirement enacted in 2019. As noted above, SSO staff are not decision or policy makers within DOH and such duties are only handled by State employees.

10) To the extent that Petitioner claims that PPL should have been disqualified from participating in RFP #20524 because it failed to disclose the purported relationship between PPL and PCG, Petitioner is simply wrong. According to Petitioner, PCG owns a small minority stake—16%—of a company that owns a second company that owns a third company that owns PPL. *See* NYSCEF No. 80 (redacted). Notably, Petitioner says nothing about the actual majority owner of this third-level affiliate. *Id.* And that is presumably because DOH does not have a contract with this majority owner,[3] and as far as I am aware, has no relationship with it.

## II. PPL WAS NOT THE "PRE-DETERMINED" CONTRACT AWARDEE AND ITS SELECTION AS STATEWIDE FI WAS BASED ON DOH'S CAREFUL EVALUATION OF THE BID SUBMISSIONS AND DETERMINATION OF PPL'S RESPONSIBILITY

11) As detailed in my 12/24/24 Affirmation, PPL was awarded the Contract for Statewide FI based on DOH's careful evaluation of the bid submissions and determination of PPL's responsibility. 12/24/24 Bassiri Aff. at pages 19-27. In its Reply, Petitioner asserts that

3 *See* https://wwe2.osc.state.ny.us/transparency/contracts/contractresults.cfm?ID=13961

PPL's purported posting of a job opening in New York, and its outreach to potential subcontractors during the procurement process, evinces PPL's knowledge that it had been pre-selected. While I have no knowledge as to whether and to what extent PPL took such steps (and did not have knowledge at the time), in my experience it is not unusual for a company hoping to be selected for a significant Contract award to take exploratory or initial steps to prepare for the possibility that it might be the awardee. This is particularly true in this situation, given the short schedule for implementation of the Contract, as mandated by the Legislature.

12) Contrary to Petitioner's contentions, my involvement as one of the members of the Technical Evaluation Committee concerning RFP #20524 is not unusual. In my various roles since joining the Department in 2019, I have participated as an evaluator in more than five bid procurement reviews.

13) In paragraph 95 of my 12/24/24 Affirmation, I made clear that I was unaware of any alleged attempts by PPL to influence the procurement during the restricted period and any such attempts would likely be brought to my attention given my role as Medicaid Director.[4] The restricted period lasted from June 17, 2024 when DOH issued the RFP to September 27, 2024 when PPL was informed of the Contract Award.

14) Petitioner claims that DOH must have had improper communications between June 17, 2024 to August 17, 2024 because in my earlier affirmation, I stated that there was no communication between DOH and PPL from August 17, 2024 to September 27, 2024.[5] Petitioner is wrong—there were no attempts to influence the procurement, as I already stated.

[4] During the restricted period, there is a prohibition on any communication made "under circumstances where a reasonable person would infer that the communication was intended to influence this procurement." RFP § 5.1.
[5] The date of PPL's bid is August 21, not August 17, 2024, as reflected in the Record.

15) Indeed, the only communication between DOH and PPL from June 17, 2024 to August 17, 2024 in relation to the RFP was a question emailed by PPL on July 1, 2024 to the authorized contact as set forth in the RFP, inquiring as to the "file size limitation for the email submission" of the bid proposals. *See* Q and A Document, Question 814, annexed as Ex. 4 to the Shapiro Aff. This communication, as reflected in the Record annexed to my 12/24/24 Affirmation, should have been mentioned in my original affirmation.

16) Petitioner claims that it was an irregularity for its bid to be scored after PPL's because Petitioner's bid was submitted first. Petitioner's claim is baseless and lacking in context. As part of each bidder's minimum qualifications they were required to complete and submit the Revised Attachment B, which, among other things, asked the bidder to provide the contact information for a state representative that could act as a reference for its experience in other states. In instances where a bidder's experience was unclear, the Department would contact the bidder's referenced state representative to clarify the situation. Upon review of Freedom Care's bid, the included Revised Attachment 3 and associated narrative were unclear as to whether the referenced statewide FI experience in Nevada met the RFP's requirements. The Department attempted to contact Petitioner's reference to ensure this minimum qualification was met, but the reference took weeks to provide a response and resulted in a delay in verifying Petitioner's bid such that it could proceed to the evaluation process. In no way did this delay impact the scoring of Petitioner's bid. These evaluations were done independently, and the evaluation members did not have access to each other's scoring tools.

17) To the extent that third parties, such as union members, press, legislators, or members of interest groups aligned with Petitioner, speculate that the selection of PPL as the

Contract awardee under the RFP was "in the bag," or predetermined, they are simply wrong. Rather, PPL's selection was the result of the review and evaluation described in my 12/24/24 Affirmation and herein.

## III. ALL BIDDERS HAD ACCESS TO THE SAME INFORMATION REGARDING SUBMISSION OF COST PROPOSALS

18) In attempting to explain why its cost proposal was significantly higher than that of PPL, Petitioner insinuates that PPL had "inside information" about what expenses were to be included in the Administrative Per Member Per Month ("PMPM") Fee required by the RFP. Again, Petitioner's assertion is incorrect. Every bidder had access to the same information, *i.e.*, as set forth in the RFP and its amendments, and in the answers provided to the questions submitted by bidders. Q and A Document, Shapiro Ex. 4. PPL was not provided and did not receive any "inside information" or preferential treatment.

## IV. PPL'S SUBCONTRACTOR SELECTION AND DOH'S APPROVAL ARE CONSISTENT WITH THE CDPAP AMENDMENT AND THE RFP

19) The CDPAP Amendment requires that PPL subcontract with at least one FI entity per rating setting region that has been providing FI services since 2012. SSL § 365-f(4-1)(a)(ii-b). This requirement helps ensure uninterrupted FI services and sufficient access statewide. (The CDPAP Amendment does not use the term "core" in this regard; rather, PPL used that term in its bid submission and in post-award communications.) All proposed subcontractors are subject to DOH review and approval.

20) As noted in my original affirmation, the RFP required that the awarded Statewide FI could not be an entity that is owned or controlled by a LHCSA in New York or that owns or holds a controlling interest in a LHCSA in New York. Any actual or perceived conflicts of interest

were to be addressed in the bidder's Administrative Proposal through a detailed narrative that focused on how the conflict would be mitigated.

21) To date, PPL has proposed and DOH has approved 31 subcontractors, as reflected on PPL's website. At least four of them—one in each region—meet the subcontractor requirements of the statute and RFP discussed above.

22) In my 12/24/24 Affirmation (¶¶ 53, 102), I stated in two sentences that the inclusion of any proposed subcontractor network in a bidder's proposal was not considered by DOH in the scoring process. That was inaccurate. In fact, in response to some questions, evaluators' comments referenced PPL's and Freedom Care's proposed subcontractor networks.

23) Although I now realize that my earlier affirmation erred on this point, given that it was filed long after the RFP process concluded and the Statewide FI was selected, naturally, no bidder relied on it. Accordingly, my inadvertent misstatement in my 12/24/24 Affirmation does not impact the Record upon which DOH's determination was made.

24) In contrast, the RFP that was relied on by all bidders makes clear that bidders "may propose the use of subcontractors consistent with this section," but that a bidder "is not required to identify all subcontracting arrangements in this response." RFP 5.7. The questions and answers for the RFP were consistent with this language that a bidder may propose subcontractors. In one answer, DOH noted "Bidders shall demonstrate in the proposal their <u>or their subcontractors'</u> experience and ability to engage with any consumer or personal assistant who speaks any language and in a culturally competent manner and to engage with consumers of all physical, developmental and neurological abilities including those that are hearing or visually impaired. How this is to be accomplished is at the bidder's discretion." Answer to Question 256, Q and A Document

(emphasis added). In short, all bidders, including PPL and Freedom Care, had the discretion under the RFP to set forth their network of proposed subcontractors.

V. PPL SATISFIED THE FINANCIAL REQUIREMENTS OF THE RFP

25) As previously set forth in my 12/24/24 Affirmation, PPL met all requirements of financial ability required by the RFP. The RFP requires that PPL maintain a revolving line of credit for at least $100 million at all times to ensure sufficient liquidity to meet worker payroll obligations, including compliance with overtime and wage parity laws, without delays. *See* Exhibit 3 at 14–15.

26) Petitioner's claim that PPL's post-Award request for pre-payment by MCOs violates the RFP is without merit. The RFP did not bar the Statewide FI and MCOs from reaching agreements on payment terms, including pre-payment of direct care service costs. These types of financing arrangements are left to the contracting parties to negotiate. DOH is not involved in these negotiations and does not dictate their terms, and confirmed as such in response to Question 696, which asked: "Does the state mandate the MCOs provide an Advance Payment of Pre-Funding of gross payrolls plus employer taxes?" Q and A Document. In response, DOH stated: "Agreements between the Statewide Fiscal Intermediary and the MCOs will be negotiated by the parties."

Case 1:26-cv-03601-OEM-JRC Document 50-4 Filed 09/11/26 Page 12 of 12 PageID #: 759

27) To my knowledge, prior to the CDPAP Amendment, New York was one of very few states, if not the only state, in which such MCO pre-payments were not routinely utilized.

WHEREFORE, it is respectfully requested that the Court deny Plaintiff's Petition, Motion for a Preliminary Injunction, and expedited discovery.

Dated: January 17, 2025

AMIR BASSIRI